LAGESEN, P.J.
*133 In this appeal by father of a juvenile court judgment changing the permanency plan for father's son, Z, from reunification to adoption, we are called upon once again to assess the efforts that the Department of Human Services (DHS) must make to reunify a child, committed to its care by the juvenile court, with an incarcerated parent before the juvenile court may change the child's permanency plan from reunification to another plan. The legal question presented is whether a parent's lengthy term of incarceration, standing alone, means that DHS is excused *1008 from making efforts to reunify the child with the incarcerated parent, such that the child's permanency plan may be changed from reunification. In other words, when a parent's term of incarceration is lengthy, do minimal to no efforts constitute "reasonable efforts" within the meaning of ORS chapter 419B. Our case law supplies the answer to that question: no. Because the juvenile court concluded otherwise, and relied on that erroneous conclusion to change Z's permanency plan, we reverse and remand.
STANDARD OF REVIEW
Neither party has requested de novo review, and we do not perceive this to be the type of "exceptional" case that would warrant de novo review. As we have explained, on appeal of a permanency judgment, "[t]he juvenile court's determination[ ] whether DHS's efforts were reasonable * * * [is a] legal conclusion[ ] that we review for errors of law." Dept. of Human Services v. G.N. , 263 Or.App. 287, 294, 328 P.3d 728, rev. den. , 356 Or. 638, 342 P.3d 1024 (2014). In conducting that review, we are bound by the juvenile court's explicit factual findings if there is evidence to support those findings. Id . To the extent that a court does not make its findings express, we presume that the court made any necessary implicit factual findings in a manner consistent with its ultimate legal conclusion. Id . However, "[i]f an implicit factual finding is not necessary to a trial court's ultimate conclusion or is not supported by the record, then the presumption does not apply." Pereida-Alba v. Coursey , 356 Or. 654, 671, 342 P.3d 70 (2015).
*134 FACTUAL AND PROCEDURAL BACKGROUND
The juvenile court issued a thorough and thoughtful letter opinion explaining its ruling. Consistent with our standard of review, we draw the facts primarily from the court's express findings in its opinion, supplementing them with consistent facts drawn from the record, and also from the procedural history of the case.
DHS became involved with Z's family in March 2016. At that time, Z was living with mother and father was in jail awaiting trial on charges of sexual offenses against one of mother's minor relatives. DHS became involved because of concerns about mother's parenting and father's unavailability to parent Z because of his incarceration. Two months later, on May 21, 2016, the juvenile court took jurisdiction over Z after concluding that Z's conditions and circumstances endangered his welfare within the meaning of ORS 419B.100(1)(c).[1] By that time, father had been convicted of some of the charges against him, and had been sentenced to more than 30 years in prison. The court's jurisdictional determination was based on two admissions by parents: mother's admission that her "substance abuse interferes with her ability to safely parent the child" and father's admission that he "has been convicted of sexually abusing another child and is incarcerated and currently unavailable to be a custodial resource." Z was placed in substitute care with his maternal grandmother.
A few days after the juvenile court took jurisdiction, father was transferred to the Eastern Oregon Correctional Institution (EOCI) to serve his sentence. With respect to mother, DHS focused its efforts on helping mother ameliorate the risk posed to Z by her admitted substance abuse problem. Apart from its efforts to assist mother in addressing her substance abuse problem-efforts which, *135 if successful, perhaps could have ameliorated the risk to Z posed by father's incarceration by ensuring that he had a safe home notwithstanding father's incarceration-DHS made no independent efforts to assist father in addressing the risk posed to Z by father's incarceration. *1009 Rather, DHS had no contact with father for nearly 10 months. After father was transferred to EOCI, Skelton, the caseworker responsible for working with father, did not make any attempt to identify the facility where father had been transferred, apparently because Skelton believed that the juvenile court had directed father to notify Skelton where he was transferred.[2] Eventually, in July, Skelton asked father's attorney where father had been taken, and the attorney suggested that Skelton look father up on the VINE system. Skelton did so and found out that father had been taken to EOCI. After a phone call with father's prison counselor, Miles, Miles and Skelton exchanged several emails about Miles arranging a phone call between father and Z. A few months later, on October 3, 2016, Skelton emailed Miles again to ask if the phone call had taken place. Nearly a month later, Miles responded, stating that he had been "out of the office for most of August and September and was just now 'catching up,' " and he would arrange for the phone call "in the next week or two." Miles did not follow through.
Mother died unexpectedly of a drug overdose on October 6, 2016. Still, DHS did not contact father. Rather, on November 22, 2016, Rhonda Riley emailed Skelton that she would be father's new prison counselor. Thereafter, Riley and Skelton exchanged emails about setting up phone visits between Z and father. As a result, father had a phone visit with Z toward the end of December 2016 and another phone visit with Z at the end of January 2017. However, Skelton himself never contacted father, or arranged for another DHS worker to contact father to discuss the dependency case. Skelton did, however, send an action agreement to father at the end of December 2016 or in early January 2017.
After mother's death, DHS requested that the juvenile court change Z's permanency plan from reunification to *136 adoption. The juvenile court held a contested permanency hearing in early February 2017. As of the time of the hearing, Skelton still had not had any contact with father, apart from sending father the action agreement. Relying on Dept. of Human Services v. C.L.H. , 283 Or.App. 313, 388 P.3d 1214 (2017), father argued that DHS's efforts-or lack of efforts-toward father did not qualify as reasonable efforts for purposes of ORS 419B.476(2)(a), which governs the change of a permanency plan from reunification to adoption, and that the juvenile court should deny DHS's request to change the permanency plan because of DHS's failure to make reasonable efforts to reunify Z with father. Z's lawyer agreed with father that DHS's efforts were not reasonable, "because they didn't have contact with [father]. And they didn't make sure that he was aware of the services," but argued that the court should change the plan nonetheless. DHS disagreed, urging the court to conclude that Skelton's efforts to set up phone visits between father and Z met the statutory standard for reasonable efforts.
The juvenile court took the matter under advisement and, as noted, issued a thoughtful letter opinion explaining its decision to change the plan. The juvenile court found that it was "indeed alarming that Mr. Skelton has never spoken with [father], either by telephone or face-to-face," even though DHS administrative rules required him to have monthly face-to-face contact with father to discuss with father the conditions for achieving the return of Z, and father's progress toward meeting those conditions. The court nonetheless determined that DHS's efforts to reunify father with Z were reasonable for purposes of ORS 419B.476(2)(a) because, in the court's view, "there [were] no services or supports the DHS could have provided that could have ameliorated the jurisdictional bases as they relate to [father] in this case." In particular, the court reasoned that "[t]here is nothing that either DHS or [father] can do that could shorten the length of [father's] incarceration to make him available to parent [Z]." Further, the court concluded that father's convictions for sexual offenses against a child relieved DHS of its obligations to make reasonable efforts to reunify a parent and child under ORS 419B.340(5)(a)(D), which provides that DHS may request to be *1010 excused from the obligation to make *137 reasonable efforts to reunify a child with a parent who has been convicted of certain sexual offenses against a child. See ORS 419B.340(5)(a)(D).[3] The court also concluded that father had not made sufficient progress to permit reunification. Based on those conclusions, among others, the court entered a permanency judgment changing Z's permanency plan from reunification to adoption.
Father appeals. He assigns error to the juvenile court's determination that Skelton's efforts constituted "reasonable efforts" for purposes of ORS 419B.476(2)(a) and its corresponding decision to change Z's permanency plan from reunification to adoption based, in part, on that "reasonable efforts" determination. He argues that, as matter of law, DHS's virtually nonexistent efforts to help father address the jurisdictional basis as to him do not qualify as "reasonable efforts" under the legal standard set forth in our case law. In particular, father asserts that "[t]he department's failure to speak with father for the first nine months of the dependency case or to establish contact between father and [Z] for the first seven months renders its efforts unreasonable as a matter of law." In response, the department does not dispute that DHS had no contact with father during the first nine months of the dependency case, and also does not dispute that DHS's relatively passive efforts toward father resulted in father having no contact with Z for seven months. Rather, DHS urges us to adopt the reasoning of the juvenile court and conclude that the efforts by Skelton constitute "reasonable efforts" for purposes of ORS 419B.476(2)(a) because "[n]o amount of visitation or other services could ameliorate the basis for jurisdiction." DHS argues that the only way that father can ameliorate the basis for jurisdiction is to obtain a "much shorter prison sentence." Because DHS lacks the power to do anything to shorten father's prison sentence, it asserts that its efforts were reasonable.
ANALYSIS
Absent exceptions not applicable here, to change Z's permanency plan from reunification to adoption under *138 ORS 419B.476, the juvenile court was required to make two predicate determinations: (1) that DHS made "reasonable efforts" to reunify Z with father; and (2) that, notwithstanding those efforts, father's progress was not sufficient to permit reunification. C.L.H. , 283 Or.App. at 322, 388 P.3d 1214. For purposes of ORS 419B.476, reasonable efforts to reunify a child with his parent or parents mean efforts that focus on ameliorating the adjudicated bases for jurisdiction, and that give "parents a 'reasonable opportunity to demonstrate their ability to adjust their conduct and become minimally adequate parents.' " Dept. of Human Services v. S.M.H. , 283 Or.App. 295, 306, 388 P.3d 1204 (2017) (quoting Dept. of Human Services v. M.K. , 257 Or.App. 409, 417, 306 P.3d 763 (2013) ). That is, reasonable efforts are ones aimed at reducing or eliminating the risk of harm that led to juvenile court intervention in the first place.
Furthermore, consistent with the foregoing, the concept of reunifying a child with a parent within the meaning of the dependency statutes is not limited to physical reunification. The legislature has announced that it is "the policy of the State of Oregon to guard the liberty interest of parents protected by the Fourteenth Amendment to the United States Constitution," and, further, that the dependency statutes are to be "construed and applied" consistently with the requirements of the federal constitution. ORS 419B.090(4). Under the Fourteenth Amendment, a parent's liberty interest in parenting his child is broad, and encompasses "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." Troxel v. Granville , 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Accordingly, when the dependency code is construed in view of the scope of the fundamental Fourteenth Amendment right to parent, reunification of a child with a parent means the restoration of the parent's right to make the decisions about the child's care, *1011 custody, and control without state supervision, even if the child will not be returned to the parent's physical custody because of other impediments, such as incarceration.
Consistent with this understanding of the nature and scope of the constitutional right to parent, our cases have long recognized that the fact that a parent may not be *139 able to be physically reunited with a child because of incarceration or similar impediments does not excuse DHS from making reasonable efforts to reunify the parent and child: "It is well established that DHS is not excused from making reasonable efforts toward reunification simply because a parent is incarcerated." S.M.H. , 283 Or.App. at 306, 388 P.3d 1204 (citing State ex rel . Juv. Dept. v. Williams , 204 Or.App. 496, 506, 130 P.3d 801 (2006) ). As we have recognized, one way that an incarcerated parent may be able to ameliorate the risk of harm posed to a child by the parent's incarceration-typically, that risk appears to be that no one is available to care for the child-is by enlisting the assistance of others. Dept. of Human Services v. T.L. , 279 Or.App. 673, 685-86, 379 P.3d 741 (2016).
Under those legal standards, the juvenile court erred in concluding that DHS's virtually nonexistent efforts to reunify Z with father were reasonable for purposes of ORS 419B.476. The court reasoned that DHS's efforts were reasonable because, in its view, there was nothing DHS could do to ameliorate the basis for jurisdiction:
"In fact, I find that there are no services or supports the DHS could have provided that could have ameliorated the jurisdictional bases as they relate to [father] in this case. Nor is there anything that [father] could have done to 'make progress' toward ameliorating the fact that he is incarcerated with a scheduled release date of December 9, 2046."
Essentially, as we understand the court's ruling, the court concluded that any efforts to ameliorate the jurisdictional basis as to father would have been futile, so as to excuse DHS from making any efforts toward assisting father.[4]
*140 That determination is erroneous for three reasons.
First, the juvenile court's conclusion that father's incarceration, on its own, effectively excused DHS from making efforts to ameliorate the risk posed to Z by father's incarceration conflicts with our longstanding recognition that the fact of incarceration, standing alone, does not relieve DHS of its obligation to make reasonable efforts to ameliorate the bases of jurisdiction. S.M.H. , 283 Or.App. at 306, 388 P.3d 1204.
Second, the juvenile court's ruling rests on an erroneous understanding of the jurisdictional basis as to father. The juvenile court did not take jurisdiction over Z as to father based on the simple fact of father's incarceration and inability to serve as a custodial resource. Rather, it took jurisdiction over Z as to father because father's incarceration, and his correlative unavailability as a custodial resource, endangered Z. Indeed, the juvenile court could not lawfully have taken jurisdiction over Z as to father unless father's incarceration and inability to serve as a custodial resource subjected Z to a current risk of serious loss or injury that was reasonably likely to be realized in the absence of juvenile court jurisdiction. T.L. , 279 Or.App. at 678, 379 P.3d 741 (articulating standard for juvenile court dependency jurisdiction). Said another way, the incarceration of a parent only provides a basis for juvenile court jurisdiction over a child if, as a result of *1012 that incarceration, the child faces a threat of serious harm, and there is a reasonable likelihood that that harm will come about.
Third, and relatedly, the juvenile court's misunderstanding of the jurisdictional basis as to father led it to erroneously conclude that there is nothing that DHS could do to assist father in ameliorating the risk of harm posed to Z by his incarceration. Although the court was correct that there was nothing that DHS could do to ameliorate father's incarceration, and therefore could not ameliorate the risk of harm to Z by shortening father's sentence, that does not mean that there was nothing that DHS could do to ameliorate the basis for jurisdiction. The court report that DHS prepared for the permanency hearing lays out what father must achieve to obtain Z's "return" while incarcerated, and explicitly contemplates that father may be able to do so by *141 enlisting the assistance of another caregiver to provide a safe home for Z. Significantly-and consistently with our case law-the report does not state that father must obtain freedom and personally provide care for Z. Instead, it states that the "Conditions of Return" for father are as follows:
"There will be a home like setting that is safe, stable and sanitary where the child can live.
"The home environment will be calm, free of violence, negative attitudes and substance abuse that will affect the child's wellbeing.
"A parent/caregiver who is willing to cooperate with the safety plan, working with DHS and community partners cooperatively and allowing them access to their home for services.
"The parent/caregiver will identify safety service providers, approved by DHS, which can assist in implementing the safety plan to assure child safety."
(Emphases added.)
At the very least, DHS could have discussed with father whether he had any ideas about how to satisfy these conditions from the confines of prison, and assessed whether father's ideas, if any, would be ones that father could accomplish with reasonable assistance from DHS. Yet DHS did not make even that minimal effort.
Under these circumstances, the undisputed facts demonstrate that father was not given the "reasonable opportunity" contemplated by ORS 419B.476 to demonstrate that he was capable of parenting Z. S.M.H. , 283 Or.App. at 306, 388 P.3d 1204. DHS's efforts, as a matter of law, therefore were not reasonable for purposes of the statute. The juvenile court erred in concluding otherwise and in changing the permanency plan based on that erroneous "reasonable efforts" determination.
The question remains whether we must reverse. As noted, the juvenile court also found that, as a result of father's conviction, DHS was excused under ORS 419B.340(5) from making reasonable efforts by virtue of his convictions. Both parties agree that the juvenile court necessarily intended that finding to operate prospectively only *142 and that, therefore, the finding does not supply an alternative basis for affirmance, and father has not assigned error to the juvenile court's decision to excuse DHS from further efforts. Although the parties have not raised the point, the court's finding under ORS 419B.340(5) raises the question of whether a reversal will have a practical effect on father's rights, in view of the fact that DHS no longer has the obligation to make reasonable efforts to reunify father with Z.
It will. As a result of a reversal, father will be entitled to a new permanency hearing. At that hearing, the court necessarily will have to consider whether father has made sufficient progress toward meeting the conditions for reunification with Z, even absent the assistance of DHS. In other words, the fact that a court excuses DHS from assisting a parent does not preclude a parent from acting independently to achieve the return of the parent's child. Thus, notwithstanding the juvenile court's decision to excuse DHS from further reasonable efforts, our decision will have a practical effect on father's rights because he will be entitled to advocate that the permanency plan should remain reunification because of father's own efforts to redress the jurisdictional bases or, alternatively, that the circumstances warrant a different permanency plan that does not contemplate the complete *1013 severance of father's parental relationship with Z. For that reason, we conclude that the juvenile court's legal error is one that requires reversal of the permanency judgment on appeal.
The dissenting opinion would reach a different conclusion. However, its approach does not comport with the rule of law that governs in these cases. Our case law is clear: DHS's efforts qualify as reasonable for purposes of ORS 419B.476 if and only if those efforts supply a parent with "a reasonable opportunity to demonstrate [his] ability to adjust [his] conduct and become [a] minimally adequate parent[ ]." S.M.H. , 283 Or.App. at 306, 388 P.3d 1204. Nowhere does the dissenting opinion explain how DHS's efforts met that legal standard. Instead, the dissenting opinion advances three primary arguments for affirmance. None hold up.
The dissenting opinion first argues that reversal is inappropriate because father never specifically identified *143 for the juvenile court what specific additional efforts DHS should have made. 290 Or.App. at 150, 413 P.3d at 1016 (DeVore, J., dissenting). But that was not the legal question before the juvenile court. The legal question before the juvenile court was whether DHS's efforts gave father a "reasonable opportunity" to demonstrate that he could ameliorate the risk of harm posed to Z by father's incarceration. Here, DHS's efforts did not meet that standard. DHS did not even talk to father or let him know what he had to do to achieve Z's return until months into the case. Moreover, there is no authority for the dissenting opinion's proposition that a parent must identify what additional efforts that DHS should have made to dispute the reasonableness of the efforts that DHS did make. In that regard, it is worth observing that families that enter the dependency system do so because they need help with parenting, and DHS is charged with supplying that help. That did not happen here.
Next, the dissenting opinion appears to argue that we are inappropriately engaging in de novo review, implicitly suggesting that, absent de novo review, affirmance would be required. 290 Or.App. at 150-51, 413 P.3d at 1016-17 (DeVore, J., dissenting). But we have not engaged in de novo review; instead, we have taken the historical facts about DHS's efforts directly from the juvenile court's opinion, and have not supplanted those facts with our own factual findings. Beyond that, the law is clear that we review a juvenile court's reasonable efforts determination for legal error. G.N. , 263 Or.App. at 294, 328 P.3d 728 ("The juvenile court's determinations whether DHS's efforts were reasonable and the parent's progress was sufficient are legal conclusions that we review for errors of law."). That is the standard of review that we have applied to determine the legal correctness of the juvenile court's reasonable efforts determination.
Finally, the dissenting opinion suggests that it is "curious" for us to reverse in view of the juvenile court's unchallenged prospective determination that DHS is excused from making additional reasonable efforts under ORS 419B.340(5). 290 Or.App. at 149, 150 n. 3, 413 P.3d at 1015-16 (DeVore, J., dissenting). But, as we have explained, the fact that DHS is excused from making reasonable efforts to assist a parent *144 does not equate to a conclusion that the appropriate permanency plan for the parent's child is adoption, if the parent, acting independently of DHS, ameliorates the bases for jurisdiction or, short of that, demonstrates that a permanency plan other than adoption is in the child's best interests. Moreover, the juvenile court's decision to change the permanency plan is a significant decision that has profound implications for father's fundamental right to parent, as well as for Z's future. Dept. of Human Services v. T.L. , 358 Or. 679, 692, 369 P.3d 1159 (2016) (explaining that a change in permanency plan "marks a profound change of course in the path to finality for children in care"). Given the profound nature of the decision, and its potential for long-lasting repercussions for both father and Z, we see nothing "curious" about remanding, where the court's previous decision was based on an incorrect application of the law, and where further proceedings based on additional information could lead to a different conclusion regarding the best course of permanency for Z. We acknowledge that a remand may delay finality, but that is what *1014 we understand adherence to the rule of law to require in this case.
Reversed and remanded.

ORS 419B.100(1)(c) states, in part, that "the juvenile court has exclusive jurisdiction in any case involving a person who is under 18 years of age and * * * [w]hose condition or circumstances are such as to endanger the welfare of the person or of others." For purposes of ORS 419B.100(1)(c), a child's condition or circumstances endanger the child's welfare if "the child is facing a current threat of serious loss or injury, and there is a reasonable likelihood that the threat will be realized." Dept. of Human Services v. T.L. , 279 Or.App. 673, 678, 379 P.3d 741 (2016) (internal quotation marks and emphasis omitted).

The record does not supply a basis for assessing whether Skelton's belief was accurate, and the juvenile court made no findings on that point.

In its original letter opinion, the court found that DHS was excused from the reasonable efforts requirement under ORS 419B.502(1). However, that statute does not apply in dependency proceedings. The court later amended its letter opinion to refer to ORS 419B.340(5).

The court may have inadvertently applied the "reasonable efforts" standard in the statute governing shelter hearings, ORS 419B.185(1)(a). Under that statute, the legislature explicitly has directed juvenile courts to find that DHS made reasonable efforts to reunify the family if the juvenile court "finds that no services were provided but that reasonable services would not have eliminated the need for protective custody." ORS 419B.185(1)(a) (providing that "the court shall consider the department to have made reasonable efforts" under circumstances where the court finds that no services would eliminate the need for protective custody). In contrast with ORS 419B.185, ORS 419B.476(2), which governs the reasonable efforts determination in permanency hearings, does not contain a similar provision authorizing a juvenile court to equate no efforts with reasonable efforts under circumstances in which the court finds that there are no services that could ameliorate a jurisdictional basis.