Argued and submitted July 29, affirmed November 20, 2019

In the Matter of Z. S.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

L. S.,
aka L. L. S.,
*Appellant.*

Marion County Circuit Court
16JU02171; A170190

453 P3d 607

Father appeals from a judgment entered after a permanency hearing, assigning error to the juvenile court's denial of his motion to dismiss dependency jurisdiction and change of the permanency plan from reunification to adoption for his child, Z. Father argues that, because the child's maternal grandmother can continue to care for Z in a "probate" guardianship while father is in prison, the jurisdictional basis does not pose a current, nonspeculative risk of harm to the child and, thus, the court was required to dismiss the dependency jurisdiction and terminate the court's wardship of Z. *Held*: The evidence supports the juvenile court's findings that father's plan did not ameliorate the threat of harm posed to Z by the jurisdictional basis and those findings were sufficient to continue the dependency jurisdiction.

Affirmed.

Cheryl A. Pellegrini, Judge.

Sarah Peterson, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Office of Public Defense Services.

Inge D. Wells, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Powers, Judge, and Mooney, Judge.

ORTEGA, P. J.

Affirmed.

**ORTEGA, P. J.**

In this dependency proceeding, father appeals from a judgment entered after a permanency hearing, assigning error to the juvenile court's denial of his motion to dismiss dependency jurisdiction and change in the permanency plan from reunification to adoption for his child, Z. Father argues that, because the child's maternal grandmother can continue to take care of Z in a "probate" guardianship while father is in prison, the jurisdictional basis does not pose a current, nonspeculative risk of harm to the child and, thus, the court was required to dismiss the dependency jurisdiction and terminate the court's wardship of Z. The juvenile court found that father's plan did not ameliorate the threat of harm to Z posed by the jurisdictional basis, and we conclude that the evidence supports the court's findings. Accordingly, we affirm.

Father does not ask us to take *de novo* review, and we decline to do so. ORAP 5.40(8). Thus, we "view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the [juvenile] court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. D. A. N.*, 258 Or App 64, 65, 308 P3d 303, *rev den*, 354 Or 490 (2013).

In May 2016, the juvenile court took jurisdiction of Z, when he was two years old, based on the parents' admitted allegations that "mother's substance abuse interferes with her ability to safely parent the child" and that "father has been convicted of sexually abusing another child and is incarcerated and currently unavailable to be a custodial resource." Father's scheduled release date from prison is in 2046, at which time Z will be in his thirties. Z was placed with his maternal grandmother (grandmother). In October 2016, mother died of a drug overdose.

After mother's death, the juvenile court changed Z's plan from reunification to adoption, and father appealed that judgment. While that appeal was pending, the juvenile court terminated father's parental rights to Z, and father also appealed that judgment. On appeal, we reversed the juvenile court's permanency judgment changing Z's plan

to adoption because the Department of Human Services (DHS) had not made reasonable efforts to reunify Z with father. *Dept. of Human Services v. L. L. S.*, 290 Or App 132, 133, 413 P3d 1005 (2018). As a result, we also vacated the judgment terminating father's parental rights to Z. *Dept. of Human Services v. L. L. S.*, 292 Or App 212, 213, 418 P3d 776 (2018).

Following the disposition in those appeals, in July 2018, father moved to dismiss jurisdiction and terminate the court's wardship of Z. In support of his motion, father explained that, while he is incarcerated, his plan for Z is to be cared for by grandmother under a probate guardianship, which does not require juvenile court involvement. He also stated that, if grandmother was unwilling to serve as Z's guardian, father's friend, Glenn Fluhr, would serve as Z's guardian. DHS also sought a plan change for Z from reunification to adoption, which father opposed.

The juvenile court conducted a combined hearing on the request to change Z's plan and father's motion to dismiss. At the time of the hearing, Z was four years old. At the hearing, DHS presented evidence that Z has confusion about who father is and has anxiety about his video visitations with father, which results in Z having difficulties, such as tantrums, on those days. Z is very attached to grandmother. However, it took nearly a year for Z to trust that he was safe with grandmother and that she would return if she dropped him off somewhere. Z has demonstrated symptoms suggestive of post-traumatic stress disorder, such as nightmares, separation anxiety, and difficulty trusting others, and was having episodes "that could be termed a dissociation" that have dissipated over time with his current placement but would return with disruption to that placement. Z still has difficulties with separation anxiety, and he requires stability to develop trust and a secure attachment. Any question about who is going to care for him or disruption to his daily routine causes Z to suffer anxiety. Z is very aware of what is going on around him and has a constant need to know "what we're doing, where we're going, and who we're going to be with." Z's caseworker testified that guardianship "doesn't offer the ongoing level of stability and security that [Z] would need, particularly that would ease the anxiety that

he experiences and will continue to experience if he doesn't have a permanent placement."

Grandmother is willing to adopt Z but, if that is not possible, she is willing to become his permanent guardian. However, she does not believe that father's plan would be good for Z because efforts by father to dissolve the guardianship or resolve disputes over Z's care in court would further disrupt Z's life, when what he needs is permanency and stability.

Father's friend, Fluhr, who father proposed as an alternate guardian, has had no recent contact with Z and he has not sought to establish that contact. Fluhr also did not follow through with paperwork to become a foster parent for Z.

Father testified at the hearing about his plan for Z. He clarified that he was proposing a guardianship that would not have any DHS involvement. He testified that "[r]ight now I'd like to see a guardianship with [grandmother]. *** And then when my appeal goes through, I'll be sitting in that courtroom with you getting my son back." He also stated at various times that "when I get out, I'm going to take control of my son. There's no reason for adoption"; that Z should wait for father to get out of prison "[p]robably as long as it takes" because "I'm his dad"; and that it was not his plan that Z would still be placed with grandmother in five years. Father testified that he does not like members of grandmother's immediate family and that is why it is best for Z to be taken care of by father. Father also testified that he cannot contribute financially to Z's care and confirmed that he has not discussed his plan of care for Z with grandmother.

The juvenile court denied father's motion to dismiss and changed Z's permanency plan from reunification to adoption, explaining its reasoning in a lengthy letter opinion. As relevant to the issue raised on appeal, the court first found that the jurisdictional basis—*i.e.*, that "father has been convicted of sexually abusing another child and is incarcerated and currently unavailable to be a custodial resource"—continues to pose a threat to Z "that remains reasonably likely to be realized." The court explicitly found that was so because father remains incarcerated with a

release date of 2046, he was convicted of sex crimes involving a child but denies that he committed the acts, and father "denies that the charges bear any relevance to his parenting skills or judgment and does not believe he needs a parenting class." The court also found that father was focused on his own circumstances and not on Z's circumstances.

The juvenile court also found that father's plan of guardianship for Z would not mitigate that threat. In making that determination, the court stated:

> "It is important to note that the jurisdictional basis is not simply that Father is incarcerated; it is that he was convicted of sexually abusing another child *and* is incarcerated. Simply being released from custody or having another caregiver available would not ameliorate the risk of harm to the child posed by Father's history of sexually abusing another child, particularly given that the child Father sexually abused was a child he resided with and parented."

(Emphasis in original.) The court first found that Fluhr was not a viable guardianship resource and that placing Z with him would not ameliorate the risks to Z, because Fluhr has spent virtually no time with Z, has been unwilling to work with DHS to learn about Z's needs and circumstances, has made no effort to establish a relationship with Z, and "appears to view his role as guardian as being a mere placeholder who would warehouse [Z] until such time as Father came to get him."

The court also found that a guardianship with grandmother would not ameliorate the current threat of harm to Z. With respect to that finding, the court stated:

> "While the Court finds that maternal grandmother would take all available steps to ameliorate the threat posed by Father's lack of insight into his parenting deficits, the plan of guardianship would undermine her efforts. Father made clear that he proposed this plan precisely because it is the one best calculated to achieve his goal of regaining custody of the Child with as little resistance as possible. In other words, he is proposing this plan because he believes it is the one he can most quickly and easily dissolve."

The court also set out its reasoning for changing Z's plan to adoption. With respect to that change, the court

found that father "has made no effort to ameliorate his considerable parenting deficits and adjust his conduct to become a minimally adequate parent," that the proposed guardianship would not meet Z's health and safety needs for security and certainty, and that Z expresses confusion about who father is and has not bonded with father during the video visits. The court further found that father's plan, which includes father's express intent to dissolve the guardianship as soon as feasible, exposes the child to uncertainty, possible disruption, and instability and would delay permanency and the opportunity for Z to form a healthy attachment to his long-term caregiver. The court then entered a permanency judgment changing Z's permanency plan to adoption, which also incorporated the court's letter opinion.

Father appeals from the permanency judgment, assigning error to the juvenile court's denial of his motion to dismiss dependency jurisdiction and change in Z's permanency plan. On appeal, father's sole argument for both assignments of error is that the court was required to dismiss dependency jurisdiction.

A motion to dismiss dependency jurisdiction presents a two-part inquiry. *Dept. of Human Services v. T. L.*, 279 Or App 673, 684, 379 P3d 741 (2016). First, "[t]he court must determine whether the original bases for jurisdiction continue to pose a current threat of serious loss or injury." *Id.* at 685. "If the court determines that they do, it then must assess the likelihood that the risk will be realized." *Id.* "If there is no reasonable likelihood of harm to the child's welfare in the absence of dependency jurisdiction, there is no basis for dependency jurisdiction to continue." *Id.* Evidence that another person is available to assist the parents in providing care for the child is relevant to the inquiry, and the court must consider it in making that determination. *Id.* Here, because the plan for Z was reunification, DHS, as the proponent of continued jurisdiction, bore the burden by a preponderance of the evidence to show that "the factual bases for jurisdiction persisted to a degree that they posed a current threat of serious loss or injury that is reasonably likely to be realized." *Dept. of Human Services v. A. R. S.*, 258 Or App 624, 635, 310 P3d 1186 (2013), *rev dismissed*, 355 Or 668 (2014).

On appeal, father does not dispute the juvenile court's finding that the original basis for jurisdiction over Z continues to pose a current threat of serious loss or injury to Z. Father argues only that, because grandmother can continue to care for Z in a probate guardianship, there is no likelihood of that risk being realized in the absence of dependency jurisdiction. Specifically, father asserts that the evidence showed that, even without dependency jurisdiction, grandmother would safely care for Z, which ameliorates the risks of father being unavailable to parent due to his incarceration. Father argues that grandmother disfavoring that plan does not matter because grandmother testified that she would still care for Z. Father further argues that any disputes between father and grandmother could be resolved in circuit court, without juvenile court involvement.

Although a court must consider a parent's plan to have a third party provide care for their child in making the required two-part inquiry on a motion to dismiss, such a plan is not dispositive of that inquiry. The key question the factfinder must address is whether the parent's plan, *as a factual matter*, mitigates the threat posed to the child's welfare by the jurisdictional bases such that that threat is no longer reasonably likely to be realized. *See T. L.*, 279 Or App at 686 (explaining how a parent's plan for caregiver help can be probative to the factfinder's inquiry); *see also Dept. of Human Services v. A. B.*, 271 Or App 354, 372, 350 P3d 558 (2015) ("[T]he mere fact that a child is being adequately cared for by a nonparent does not prohibit the court from taking jurisdiction, as long as the totality of the child's circumstances expose the child to a current risk of serious loss or injury."). In assessing the court's factual findings on that inquiry, we

"(1) assume the correctness of the juvenile court's explicit findings of historical fact if these findings are supported by any evidence in the record; (2) further assume that, if the juvenile court did not explicitly resolve a disputed issue of material fact and it could have reached the disposition that it reached only if it resolved that issue in one way, the court implicitly resolved the issue consistently with that disposition; and (3) assess whether the combination of (1) and (2), along with nonspeculative inferences, was legally sufficient to permit the [juvenile] court['s determination]."

*Dept. of Human Services v. N. P.*, 257 Or App 633, 639-40, 307 P3d 444 (2013).

In this case, the juvenile court explicitly found that father's plan did not ameliorate the threat of harm to Z posed by the jurisdictional basis, and we conclude that the evidence supports the court's findings. The court identified the current threats to Z's welfare posed by father's lengthy incarceration for sex crimes against a minor was not just his unavailability to parent, but also that father denies his crimes, does not recognize a connection between his crimes and his parenting skills, denies that he has any parenting deficits, and was focused throughout his testimony on his own circumstances and regaining "control" of Z and not on Z's circumstances. Those findings are supported by the evidence, and father does not assert otherwise.

The court also found that father's plan to place Z in a probate guardianship with grandmother did not ameliorate those risks because father's plan would undermine grandmother's efforts to protect Z from the harms posed by father's incarceration for sex crimes. Specifically, the court found that father only proposed the probate guardianship because it would be the easiest guardianship to dissolve and regain control of Z. Again, those findings are supported by the evidence. Additionally, in addressing the appropriate plan for Z, the court further found that father's proposed guardianship plan, in general, would not ameliorate the nonspeculative risk of harm to Z because that plan prevents Z from having his health and safety needs met, which include his heightened need for security, permanency, and secure attachment. Those findings were also supported by evidence in the record.

We also conclude that the court's findings taken together were sufficient for the court to conclude that it could continue its jurisdiction over Z. In so concluding, we emphasize that this is not a case in which a parent was working cooperatively with a caregiver to obtain stability and permanency for their child outside of juvenile court dependency. Here, father had not discussed his plan with grandmother, and grandmother, the proposed guardian, opposed the plan and believed that it would harm Z's welfare. Father's

alternative proposed guardian, Fluhr, had not even made minimal efforts to contact Z or learn about his needs. As the juvenile court found, father was seeking to establish a probate guardianship as a means to regain control of his son in the easiest way possible. As a result, that proposed plan did not ameliorate the likelihood that the current, nonspeculative threats to Z's welfare caused by father's incarceration for sex crimes against a minor would be realized.

Thus, we conclude that, viewing the evidence, as we must, in the light most favorable to the juvenile court's decision to deny father's motions to dismiss jurisdiction, the record is legally sufficient to support the court's determination. Accordingly, we affirm.

Affirmed.