Argued and submitted January 15, affirmed March 24, 2021

In the Matter of E. B.-M.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*
*and*

E. B.-M.,
*Respondent,*

*v.*

D. M.,
aka D. D. R. M.,
*Appellant.*

Deschutes County Circuit Court
18JU06441; A174476

483 P3d 1248

Father appeals from a permanency judgment that changed the plan for his child from reunification to adoption. He argues that the Department of Human Services (DHS) failed to prove that it made reasonable efforts to reunify father and the child and that father failed to make sufficient progress to allow for reunification. He also argues that he proved that a compelling reason exists for DHS not to file a petition for termination of his parental rights, because he was making sufficient progress for the child to return home within a reasonable time. *Held*: Under the totality of the circumstances, the juvenile court did not err in concluding that DHS had made reasonable efforts and that father had not made sufficient progress. Additionally, the record supported the juvenile court's findings, which in turn were sufficient to support the legal conclusion that father had not proved a compelling reason not to terminate his parental rights.

Affirmed.

Alicia N. Sykora, Judge.

Kristen G. Williams argued the cause and filed the briefs for appellant.

Kirsten M. Naito, Assistant Attorney General, argued the cause for respondent Department of Human Services. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Erica Hayne Friedman argued the cause for respondent E. B.-M. Also on the brief was Youth, Rights & Justice.

Before Ortega, Presiding Judge, and Powers, Judge, and Kamins, Judge.

ORTEGA, P. J.

Affirmed.

**ORTEGA, P. J.**

Father appeals from a permanency judgment that changed the plan for his child, E, from reunification to adoption. He argues that the juvenile court erred in concluding that the Department of Human Services (DHS) had proved that it made reasonable efforts to reunify father and E and that father failed to make sufficient progress to allow for reunification. Father also argues that he proved that a compelling reason exists for DHS not to file a petition for termination of his parental rights. Based on those arguments, father argues that the court erred in changing E's case plan from reunification to adoption.[1] We conclude that the juvenile court did not err in making any of the rulings challenged by father, and we therefore affirm.

Father does not ask us to take *de novo* review, and we decline to do so. ORAP 5.40(8). The juvenile court's determinations that DHS made reasonable efforts, that father made insufficient progress, and that father failed to prove a compelling reason are legal conclusions that we review for errors of law. *Dept. of Human Services v. S. J. M.*, 364 Or 37, 56-57, 430 P3d 1021 (2018); *Dept. of Human Services v. G. N.*, 263 Or App 287, 294, 328 P3d 728, *rev den*, 356 Or 638 (2014). "In conducting that review, we are bound by the juvenile court's explicit factual findings if there is evidence to support those findings." *Dept. of Human Services v. L. L. S.*, 290 Or App 132, 133, 413 P3d 1005 (2018). We also "presume that the court made any necessary implicit factual findings in a manner consistent with its ultimate legal conclusion." *Id*. We summarize the facts most important to our analysis in accordance with that standard. We note, however, that our summary does not capture the totality of evidence presented in this case and on which the juvenile court relied in making its findings.

E was born in June 2017. At the time of the permanency hearing, E was three years old. Outside of four or five months that she lived with her father, E had lived her entire life with her foster parents. When E was about one month old, she was removed by DHS for the first time and placed

---

[1] We reject father's assignment of error to the court's denial of his motion for summary judgment without further discussion.

with foster parents. In March 2018, at 10 months old, E was returned to father's care, and, a couple of months later, the DHS dependency case was closed. During that reunification, E lived with father and stepmother,[2] and stepmother's son, who was about two and one-half years old at that time. Shortly after E was reunited with father, stepmother gave birth to E's half-sister. After about four months in father's and stepmother's care, in July 2018, E was again removed and placed with the same foster parents she had been placed with before. E's stepbrother and half-sister were also removed at that time and placed with the same foster family as E.

A domestic violence incident prompted the children's removal, when father called the police due to a loud and physical argument between father and stepmother that included stepmother throwing and breaking items. Father was holding E's baby half-sister and filming stepmother during part of the argument. By all accounts, father and stepmother fought often. Upon further investigation, the police and DHS became concerned about physical injuries to E and her stepbrother, as well as the unsafe and unsanitary condition of the home. Father reported that he was concerned about stepmother's anger toward the children and that he had suspicions about stepmother's care of E, because of bruising on E that he had seen, but he did not want to accuse stepmother of anything. Father also stated that he thought stepmother was "jealous" of the bond between him and E. Father and stepmother had pictures on their phones of bruises and red marks on E. The police also learned that stepmother was verbally abusive toward the children, would withhold water from E and her stepbrother as punishment, and also would ignore E or lock her in her room as punishment.

As a result of the investigation, stepmother was charged with multiple counts of first-degree criminal mistreatment and third-degree assault. She pleaded guilty, by *Alford* plea, to one count of first-degree criminal mistreatment for "unlawfully and knowingly caus[ing] physical

_____

[2] When E first started living with father, he and stepmother were not married. However, they soon after married, and, for ease of reference, we refer to father's wife as E's stepmother.

injury to E," the other charges were dismissed, and step-mother was sentenced to probation.

The court took jurisdiction of E, based on father's admission to the following allegations, as amended, in the dependency petition:

"A.    The father's volatile relationship with [stepmother] presents a serious risk of psychological and physical harm to the child.

"B.    The father failed to protect the child from the physical abuse and maltreatment by father's significant other by continuing to leave the child in her care.

"C.    The father failed to maintain a safe environment for the child because the father has allowed the child to live in [a] home that is unsafe and unsanitary, including prescription medication and spoiled food being left within access of the child.

"D.    The mother is not currently a custodial resource, due to living out of state and residential instability.

"E.    The father's substance abuse, if continued and left untreated, interferes with his ability to safely parent the child."

Nearly two years after E's removal, DHS sought to change her permanency plan from reunification to adoption. The hearing to change E's plan (and to change the other two children's plans) was held over four days—two days in June 2020 and two days in July 2020.

At the hearing, E's foster mother testified that, when E was 10 months old and reunited with her father, she was "meeting or exceeding all of her ages and stages assessments," was almost walking by pulling herself up with furniture, and she knew seven words of sign language. When E returned to foster mother's care four months later, E had regressed socially and emotionally and was no longer using sign language or pulling herself up. She was also underweight. E had to have water with her for security and would eat quickly and compete with her stepbrother to grab more food. E's issues around food resolved in a few weeks, and issues around water resolved in about six months. E also exhibited aggressive behaviors and would bite and hit

her siblings and foster parents, scream, and would have emotional outbursts and observable dissociation, where she would stare off and be unresponsive to her environment. When E's siblings visit their maternal grandparents and she is alone with foster parents, she "is like a different child." She talks and is silly and "essentially comes out of her shell." When her siblings return, E reverts into her shell, not talking as much, and being "a little bit more unhappy." E's foster mother testified to a sense that being in the same home as her stepbrother and half-sister is having "a pretty significant effect on her behavior and mental health" and that the children do not seem to mind being away from each other. E's foster mother, who is a potential adoptive resource for E, is committed to keeping the children in each other's lives even if E were to remain in her care without the other children.

E began individual counseling in September 2018 and was diagnosed with "adjustment disorder, with focus on anxiety and emotional disturbance." Her treatment goals are emotional regulation, how to debrief trauma in a positive way, and social skills with her sibling interactions. Since starting work with her current counselor in May 2019, E has improved her language skills, has become more engaged with people, has increased her emotional ability, and has become less dissociated. She has regressed a few times, usually after in-person supervision with father and stepmother. Her ability to rebound after a regression has improved—taking two days, when it used to take three to five days. E's counselor testified that she cannot be reunited with father and stepmother without first repairing the relationships. Repairing the relationships requires active listening by the parents, consistent eye contact, and playing and interacting with E. Her caregivers also need particular skills to parent E, because of her trauma. E's counselor stated that her caregiver needs to have ongoing communication with the counselor to learn those skills and E's needs. She estimated that a six- to eight-month therapeutic reintroduction with home visits would be necessary for E to safely reintegrate with father and stepmother. She also emphasized that repairing their relationship with E would require father and stepmother to acknowledge the trauma

that E experienced, and that dismissing that trauma causes more trauma.

Father was given E's counselor's contact information in June 2019, and, in December 2019, he contacted the DHS caseworker to provide a release for the counselor to speak with them. The caseworker provided a release the same day. Father did not contact E's counselor until the end of January 2020, when he contacted the counselor by email. Father and stepmother had a conversation with E's counselor in February and met her in person in March. During those conversations, E's counselor stressed the tools they need to support E and gave them her direct phone number to contact her with their schedule. E's counselor did not hear from them again until after the June 2020 hearing dates. They then arranged to meet with E's counselor and the children before the next hearing date in July. However, due largely to father's and stepmother's mismanagement of time, E's counselor was able to observe father and stepmother interact with the children for only 10 or 15 minutes.

Before coronavirus restrictions began in March 2020, E would have visits with father both by video and supervised in person. Due to the distance to the foster parents' house, in-person visits were once or twice a month, and video visits were two to three times a week. After restrictions, visits were only by video for a few months prior to the permanency hearing. For the first six months following removal, E visited only with father, because stepmother was under a no contact order pending the criminal mistreatment charge. After expiration of that order, E, along with her stepbrother and half-sister, began visiting with father and stepmother at the same time. E's foster mother testified that, when stepmother was added to visitation, E would have dissociative episodes and would only engage when father was present. After all-day in-person visits with father and stepmother, upon her return, E would "go into her shell" and not eat. Often during video visits, father or stepmother would be doing other things—such as driving, shopping, working, or talking to each other—which would cause the children to disengage from the visit, but, if father and stepmother were engaged, the children were also. Before December 2019,

foster mother was never sure if father and stepmother would call for the video visits, but since that time, they have been more consistent.

Following the children's removal, father and stepmother continued to have an unstable relationship, telling people they were separating then coming back together, and they continued to have physical arguments. They started attending group and one-on-one marital counseling sessions with their pastor in the summer of 2019. However, their pastor is not a licensed counselor, having only taken two college courses and some self-taught counseling modules. The most recently reported physical argument occurred in September 2019, during which father grabbed stepmother's glasses off her face, breaking them, and took stepmother's phone. Stepmother left the home so she could make a call and later returned and locked herself in a separate room away from father. At the time, she told others that she was afraid of father. At the permanency hearing, however, stepmother minimized the argument and claimed that she just went into another room to be alone and not because she was in fear. Stepmother also minimized the argument that led to the children's removal, testifying that the children did not hear it because they were asleep in another room.

Father and stepmother testified that, after the September incident, which occurred nine months before the hearing, they recommitted to their relationship and in using the skills they have gained from their pastor, and other sources, they now have a good marriage. They both testified that they still have disagreements, but now they talk things through and do not yell or become physical. Father and stepmother also have a new baby son, who was born in April 2020. Father admitted that, around the time his son was born, he was "talking to another chick," but that he then cut off all contact with that person and is committed to stepmother. With regard to their new son, DHS conducted an assessment due to the ongoing cases with the other children, but DHS did not determine that any actions needed to be taken as to him. At the time of the permanency hearing, father and stepmother were parenting their baby son without DHS involvement.

At the hearing, both father and stepmother flatly denied that stepmother ever abused E or the other children, emphasizing that stepmother made an "*Alford* plea" to the criminal mistreatment charge, meaning that she maintained her innocence. Father minimized his previous concerns about stepmother and testified that he did not believe that any criminal mistreatment happened and that he had no current concerns about stepmother parenting E. When asked how he would protect the children if he were to develop concerns, given that he did nothing when he had concerns before their removal, he testified that "I guess I would treat all the kids equal * * * [and] just make sure that if I even had a remote suspicion, to make the call, make—make the effort to get everything sorted out before it gets that far again."

Stepmother testified that she took a plea deal only to get her children back. She admitted that she still had a short temper when her "buttons" get pushed, but she testified that "I will never admit to abusing my children, and [E] never pushed my buttons" and maintained that she "did not verbally, emotionally, or physically abuse my children." She also testified that the children have not experienced any trauma from abuse; that the only trauma they have is from being removed from her care by DHS.

With respect to services engagement, both father and stepmother engaged in case planning, obtained suitable housing, completed parenting courses, and completed mental health assessments. Father's mental health assessment found that he had no substance abuse issues and no mental health diagnoses, and no additional services were recommended. At the hearing, father did admit that he drank alcohol in April 2020. During an unannounced visit to his home in June 2020, the DHS caseworker observed empty alcohol containers and garbage piled up outside the door. Father started individual counseling one month before the hearing. He is also enrolled in a batterer's intervention program (BIP) that he started in October 2019, after being required by the court to attend one in April 2019. However, father continued to have attendance issues that, if continued, would result in his termination from BIP. When he did attend class, he was prepared and engaged. His BIP counselor testified that father had attended 22 sessions, had

missed nine sessions, and needed to attend at least 14 more sessions. If father's attendance issues continued, it could take him six months to complete the course, but he would likely be terminated from the program first. If he started attending regularly, he could complete the remaining sessions in seven to 14 weeks.

Stepmother's mental health assessment found that she had no substance abuse issues; she was diagnosed with "adjustment disorder with mixed anxiety and depressed mood" and was recommended for anger management treatment. Stepmother was referred to "Saving Grace," which works with victims of domestic violence, but she chose not to work with them. Stepmother completed an anger management class and is participating in individual counseling.

As noted, father and stepmother have been engaging in marital counseling with their pastor, who has no formal counseling training. Their pastor testified that their relationship improved once they saw the value to the lessons.

In addition to efforts mentioned above, DHS efforts to assist in reunification of E with father include facilitating case planning contact with family, monthly contact with father and E, a referral for mental health assessment and drug and alcohol assessment, a referral to Neighborhood Impact for housing assistance, a referral for BIP, referral for counseling, assistance in finding a licensed marital counselor that would accept father's insurance, encouragement to father to communicate with E's counselor, referrals for assessments and counseling for E, gas vouchers and hotel accommodations for father and stepmother for in-person visits, and travel reimbursements for foster parents to facilitate in-person visits.

At the close of evidence, the juvenile court changed E's plan from reunification to adoption. The court found that father and stepmother were credible in some respects, but were not consistently credible. The court particularly noted that stepmother asserted, with observable anger, that she will never admit to abusing the children. The court found, however, that she did abuse and neglect the children, and, specifically, abused and neglected E by physically causing bruises, locking E in her room, ignoring E, and withholding

fluids. The court further found that father did not protect E, based on his own admission. The court also found that neither father nor stepmother were acknowledging what domestic violence is.

The court found that DHS made reasonable efforts, adopting the summary of those efforts provided by DHS. The court also found that father and stepmother have not made sufficient progress. As relevant to E, the court found:

> "The primary concern in changing the permanency plan from reunification with the parent is always the child's health and safety. When we have parents sitting here saying, 'There was no domestic violence. I will never admit there's domestic violence,' right there, right out of the starting blocks, we have a problem. On this record, on these jurisdictional bases that have been admitted.

> "The Court concurs with the State and other lawyers that *** the parties are minimizing conflict, abuse of the children.

> "Turning to Father, Father has been offered a lot of services but still, as of yesterday, he still has 14 batterer's intervention visits to attend to. It—it's not that hard to do this. ***

> "It's unclear why the parents refuse to have a licensed counselor. They've got, very kindly, [father's] former bus driver, who's a pastor. That's great, but we don't need to reiterate his background does not include licensure or college except two classes.

> "*****

> "That is in no way to say that this service that the pastor has provided is not helping. *** But the problems with these parents are greater than the background and training that the pastor has identified."

The court further found that stepmother, based on her demeanor in the courtroom, still "doesn't get it" with respect to anger management. When asked whether E pushes stepmother's buttons, the court stated that "[t]he anger [step]mother demonstrated exceeded the reasonable calm question that was asked." The court found that father and stepmother are not fully engaged in using what they have learned and are not engaged with E's counselor, they

lack insight, and their home is not calm and safe. The court also noted that there seems to still be trash piled up around the home. The court noted with regard to father's admitted substance abuse jurisdictional basis that urine sampling was not asked for and recognized that father was not forbidden from drinking alcohol. However, the court found it concerning that father was still drinking as of April 2020, given the limited amount of time he has with the children, even his new baby, because of his long work hours.

The court determined that DHS met its burden and changed E's plan from reunification to adoption. The court also determined that there was no compelling reason not to proceed with termination of father's parental rights, because father "has not established that he's successfully participating in services sufficiently to let [E] return home in any reasonable time, particularly given [E's] needs."

Under ORS 419B.476(2)(a), in order to change E's permanency plan from reunification to adoption, "the juvenile court was required to make two predicate determinations: (1) that DHS made 'reasonable efforts' to reunify [E] with father; and (2) that, notwithstanding those efforts, father's progress was not sufficient to permit reunification."[3] *L. L. S.*, 290 Or App at 138. If the court determines that the plan should be changed, then it must also determine, under ORS 419B.498(2)(b),[4] whether the party resisting the plan change has proved that there is a "compelling reason" that

---

[3] ORS 419B.476(2)(a) provides:

"At a permanency hearing the court shall:

"(a) If the case plan at the time of the hearing is to reunify the family, determine whether the Department of Human Services has made reasonable efforts or, if the Indian Child Welfare Act applies, active efforts to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."

[4] ORS 419B.498(2)(b) provides, in part:

"(2) The department shall file a petition to terminate the parental rights of a parent in the circumstances described in subsection (1) of this section unless:

"*****

"(b) There is a compelling reason, which is documented in the case plan, for determining that filing such a petition would not be in the best interests of the child or ward. Such compelling reasons include, but are not limited to:

DHS should not file a petition to terminate parental rights. *S. J. M.*, 364 Or at 55.

We begin with father's arguments regarding the adequacy of DHS's efforts to reunify father and E. Reasonable efforts are "efforts that focus on ameliorating the adjudicated bases for jurisdiction, and that give 'parents a reasonable opportunity to demonstrate their ability to adjust their conduct and become minimally adequate parents.'" *L. L. S.*, 290 Or App at 138 (quoting *Dept. of Human Services v. S. M. H.*, 283 Or App 295, 306, 388 P3d 1204 (2017) (internal quotation marks omitted)). "It is always the burden of DHS to prove by a preponderance of the evidence that its efforts to assist a parent in ameliorating the jurisdictional basis were reasonable." *Dept. of Human Services v. D. M. R.*, 301 Or App 436, 443, 455 P3d 599 (2019). The reasonableness of DHS's efforts depends on the totality of circumstances of the parent and child. *Dept. of Human Services v. D. M. D.*, 301 Or App 148, 156, 454 P3d 838 (2019). "When DHS does not provide a particular service to a parent, we view the adequacy of DHS's efforts in light of the potential benefits that providing that service could have yielded." *Id.*

Father argues that the department failed to make reasonable efforts because (1) it did not refer him to any further substance abuse treatment for his alcohol use, even after DHS received evidence that father had started drinking alcohol again a year after his first assessment; (2) it did not refer father to services that would directly address his "volatile relationship" with stepmother, because father and stepmother attended marital counseling without the support or assistance of DHS, and, to the extent it would address that basis for jurisdiction, DHS did not give father adequate time to complete BIP; and (3) DHS did not refer father to services that addressed the jurisdictional bases of failure to protect the child from stepmother and failure to maintain a safe environment.

"(A) The parent is successfully participating in services that will make it possible for the child or ward to safely return home within a reasonable time as provided in ORS 419B.476(5)(c); [or]

"(B) Another permanent plan is better suited to meet the health and safety needs of the child or ward, including the need to preserve the child's or ward's sibling attachments and relationships[.]"

We reject father's arguments. With respect to substance abuse, father was referred to an assessment, which did not recommend any further treatment. Given that father did not have a substance abuse issue that required treatment, there is no indication that father could have been referred to a further service that would have yielded benefits. In the juvenile court's findings, it did note that father's decision to drink was concerning, given his limited time with his children. However, the court did not find that father had an active substance *abuse* issue, rather it was focused on father's failure to prioritize his children's needs.

With respect to his "volatile" relationship with stepmother, father was referred for counseling and BIP to address that issue. Although the referral for BIP did not occur until April 2019, it was made with sufficient time for father to engage and complete that program, had he attended regularly. DHS also provided assistance for father to find a licensed marital counselor that would accept his insurance. With respect to his failure to protect E, father was also referred for parenting courses, in addition to the counseling, as noted. More specifically, given E's needs, DHS attempted to facilitate father's and stepmother's contact with E's counselor so that he could repair that relationship and learn about E's needs, which directly relates to protecting E and maintaining a safe home. Given the totality of the circumstances, those efforts of DHS, along with the other efforts that DHS made, were reasonable.

We next address whether DHS proved that father failed to make sufficient progress. "In determining whether the parent has made sufficient progress, the juvenile court gives the highest priority to a child's health and welfare." *Dept. of Human Services v. M. K.*, 285 Or App 448, 460, 396 P3d 294, *rev den*, 361 Or 885 (2017). "Even if a parent has completed all services that have been required, evidence that a parent continues to engage in behavior that is harmful to a child supports a determination that the parent has not made sufficient progress to make it possible for the child to return home." *G. N.*, 263 Or App at 297.

Father argues that he made sufficient progress, as demonstrated by the fact that he and stepmother were

successfully parenting their newborn child without DHS assistance or intervention. He also argues that there was insufficient evidence that father's alcohol use or failure to maintain a safe home continued to pose safety risks to E, that father cannot protect E from physical abuse or maltreatment by stepmother, that father and stepmother must fully acknowledge past conduct for E to return safely, or that father's "volatile relationship" with stepmother prevents reunification.

Here, the record supports the juvenile court's findings that E suffered harm from father's and stepmother's past conduct and that acknowledging that E suffered trauma as a result of that conduct is necessary for E to return safely. E's counselor testified that such acknowledgement was necessary, and that father and stepmother would have to engage in E's treatment to learn her needs and the tools necessary to parent her without triggering her. The court could reasonably infer that father had not made sufficient progress to be able to protect E based on father's minimization of his and stepmother's past conduct and its effect on E, including his tacit denial that any of stepmother's past conduct with E constituted abuse, his minimal engagement with E's counselor, and his inability to articulate what he would do if he again had concerns about stepmother's conduct with E. The court could also reasonably infer from the record that father's and stepmother's relationship continued to be volatile, given their minimization of past conduct, downplaying of current disagreements, and father's admission to "talking with another chick" in April 2020 when his son was born. The record also supports the juvenile court's findings that father and stepmother both continue to demonstrate a lack of insight and ability to apply lessons from services to their life and parenting. Under the totality of the circumstances, the court could reasonably make the findings that it did, and those findings support the conclusion that father has not made sufficient progress for E to safely return home.

Finally, we address compelling reasons. As stated above, if the juvenile court determines that the child's plan should be changed from reunification to adoption, then it must determine whether the party resisting the plan change proved that there is a "compelling reason" that DHS should

not file a petition to terminate parental rights. *S. J. M.*, 364 Or at 55; ORS 419B.498(2)(b).

Father argues that he proved a compelling reason, because he was successfully participating in services, specifically BIP and marital counseling, and E's return to his home could occur within a reasonable time. Father also argues that adoption is not an appropriate plan for E, because one of her siblings has a plan of guardianship and her other sibling is in father's care without DHS intervention.

On this record, father did not meet his burden. First, father did not propose an alternate plan for E below. Second, father did not demonstrate that E could be returned home in a reasonable time. The record supports the juvenile court's findings, as described above, which include that E could not safely return home without father acknowledging the harm to her from his and stepmother's past conduct, which they refuse to do, that father and stepmother were not engaging with E's counselor, and father had inconsistent engagement with BIP. Those findings are sufficient to support the juvenile court's legal conclusion that there was "no compelling reason" that the filing of a petition to terminate parental rights would not be in the best interests of E. That legal conclusion is further supported by father's failure to propose an alternative plan that would better serve E's needs or to demonstrate that keeping E in the same placement with her siblings was a compelling reason not to pursue an adoption under these circumstances.

Accordingly, we affirm the juvenile court's judgment changing E's permanency plan from reunification to adoption.

Affirmed.