Argued and submitted June 15, reversed September 2, 2020

In the Matter of B. M. T.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

K. G. T.,
*Appellant.*

Benton County Circuit Court
18JU06003; A172396

473 P3d 131

In this juvenile dependency case, father appeals a judgment changing the permanency plan for his five-year-old son, B, from reunification to adoption. Father, who is incarcerated, challenges the juvenile court's determination that the Department of Human Services (DHS) made reasonable efforts to reunify B with father, which is a necessary predicate to changing his plan away from reunification. The crux of the parties' disagreement is as to whether DHS had any obligation to consider offering services beyond those available through the Department of Corrections (DOC). Father argues that DHS could not rely solely on the services provided through DOC, when it is undisputed that DOC did not offer any of the services that father needed. DHS argues that it was reasonable for DHS not to offer services beyond those available through DOC. *Held*: The juvenile court erred in determining that DHS made reasonable efforts toward reunification. Given the lack of necessary services available through DOC, DHS had to at least consider other options to provide services to father. Having failed to do so, and having failed to provide the necessary information for the court to consider the relative costs and benefits of such services, DHS failed to satisfy its burden of proof to establish that it made reasonable efforts toward reunification.

Reversed.

Locke A. Williams, Judge.

Elena Stross, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Office of Public Defense Services.

Inge D. Wells, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Aoyagi, Judge.

AOYAGI, J.

Reversed.

**AOYAGI, J.**

In this juvenile dependency case, father appeals a judgment changing the permanency plan for his five-year-old son, B, from reunification to adoption. Father, who is incarcerated, challenges the juvenile court's determination that the Department of Human Services (DHS) made reasonable efforts to reunify B with father. We agree with father that the juvenile court erred and, accordingly, reverse.

## FACTS

Father has not requested *de novo* review, and we decline to conduct *de novo* review. *See* ORS 19.415(3)(b); ORAP 5.40(8)(c). We are therefore bound by the juvenile court's factual findings as to what efforts DHS has made, so long as there is any evidence in the record to support them. *Dept. of Human Services v. J. F. D.*, 255 Or App 742, 744, 298 P3d 653 (2013). Whether those efforts constitute "reasonable efforts" for purposes of ORS 419B.476(2)(a) is a question of law that we review for legal error. *Dept. of Human Services v. V. A. R.*, 301 Or App 565, 567, 456 P3d 681 (2019).

B was born in February 2015. It is unclear whether father ever lived with B and mother, but he "was around" when B was a baby. In 2016, a court awarded sole legal custody of B to mother, with no parenting time for father. Thereafter, father was not a consistent parental resource to B, although B did spend some time with father on weekends and, in June 2018, spent three weeks with father.

In July 2018, DHS removed B from his maternal aunt's home, where he was living, and subsequently filed a dependency petition. The juvenile court entered a judgment asserting jurisdiction over B in early November 2018, identifying six jurisdictional bases related to mother and five jurisdictional bases related to father. Only the jurisdictional bases related to father are relevant to this appeal:

- that father's substance abuse interferes with his ability to safely parent B,

- that father has a history of mental health diagnosis that is currently untreated and interferes with his ability to safely parent B,

- • that father has exposed B to unsafe circumstances,

- • that father's residential instability interferes with his ability to safely parent B, and

- • that father was unable to provide for and parent B at that time.

The specifics of those jurisdictional bases are not especially relevant to this appeal, but, for context, father has a history of methamphetamine and alcohol use, has a possible past diagnosis of schizoaffective disorder or schizophrenia, may have untreated bipolar disorder, has difficulty managing his emotions and avoiding impulsive behavior, lacks adequate parenting knowledge, has been an inconsistent parental resource for B and lacks a strong bond with B, and has a history of homelessness.

In September 2018, shortly before the juvenile court entered its judgment asserting jurisdiction over B, father was convicted of theft and felon in possession of a firearm and sentenced to 30 months in prison. While in prison, he was further convicted, in June 2019, of unlawful possession of methamphetamine, felon in possession of a restricted weapon, reckless driving, unlawful entry into a motor vehicle, and theft. In part due to the pending charges, father was moved between facilities repeatedly, especially during his first seven months of incarceration. Since March 2019, father appears to have remained primarily at one facility, the Eastern Oregon Correctional Institution. Father's earliest possible release date is (or was) in the spring of 2020.

In April 2019, DHS sent father a "letter of expectations." The letter stated that the juvenile court had ordered father to complete a DHS/CWP approved parent training program; to complete a DHS/CWP approved drug and alcohol rehabilitation program; to participate fully in mental health services approved by DHS/CWP, including but not limited to individual therapy and medication management; and to maintain safe and stable housing as approved by DHS/CWP.

DHS maintained "not frequent but regular" contact with father while he was incarcerated. Over 12 months, the

caseworker spoke with father on the phone six times, and a DHS "courtesy worker" met with father twice in person to discuss the case. The caseworker did not contact father after July 2019, however, because father relayed that his attorney had advised him not to speak to the caseworker without his attorney present. During the same 12-month period, DHS arranged 10 video visits with B (typically lasting five minutes) and one in-person visit (that lasted 10-15 minutes). Another 17 video visits were scheduled but not held due to technical or logistical issues. In addition to the visits, father sent letters to B, using stamped envelopes provided by DHS.

Beyond visitation, DHS relied on the Department of Corrections (DOC) to provide father with the services that he needed to comply with the case plan, even though DHS knew—from contacting the prison twice in 2018 to determine what services were available through DOC—that virtually no services were available to father through DOC.

Regarding substance abuse services, father attended Narcotics Anonymous (NA) meetings at the prison. No other services were available to him through DOC, and DHS did not offer him any services related to substance abuse.

As for parent training, father completed a parenting program that was not "recognized by DHS" and a cognitive thinking program, which were the only services available through DOC. The DHS caseworker did not know whether DHS can contract to have someone provide a parenting assessment in prison.

As for mental health services, as described by the DHS caseworker, DOC determined that father "did not need any mental health services" and did not qualify for mental health services through DOC. In July 2019, the DHS caseworker offered to arrange a mental health assessment for father, but father told her that he did not need mental health services and was not eligible for an evaluation or services through DOC, and he "declined" an assessment.[1] Because

[1] In her testimony, the DHS caseworker initially said that she thought that she had also offered father a mental health assessment in December 2018, but she then clarified that she was looking at her notes for the wrong date. Based on her notes, in December 2018, father had "expressed frustration" to her about the

father did not feel that he needed an assessment, the case-worker never scheduled or attempted to schedule one. She did consider scheduling one but decided not to do so because of father's history of being moved among facilities.[2]

In September 2019, the juvenile court held a permanency hearing for B, who had been in foster care for 14 months at that point. The witnesses were father and the DHS caseworker, who testified consistently with the above-described facts (except that father denied having declined a mental health evaluation in July 2019—but the court found that he did). After the hearing, the court changed B's permanency plan from reunification to adoption and entered a permanency judgment to that effect.

As a necessary predicate to changing B's plan, the juvenile court concluded that DHS had made reasonable efforts towards reunification. The court noted that DHS's efforts were "complicated" by father's incarceration and "further complicated" by his multiple moves among facilities, making it "difficult to set up services." Regarding substance abuse services, the court found that DHS had offered those services "to the extent possible" but that attending NA meetings is not generally considered sufficient substance abuse treatment, no other classes were offered or available in the prison, and it would not "be reasonable to require DHS to send someone out to conduct drug and alcohol counseling just for [father]." The court did not address parent training services. As for mental health services, the court found that father had declined the assessment offered by DHS but that, even if he had agreed to it, DOC would not provide mental health services to father because he did not qualify, and it would not be "reasonable to expect DHS to send a counselor out to the facility." Finally, the court found that DHS had arranged visits between father and B in a reasonable

lack of mental health services at the prison, and, in July 2019, father had said that he was not eligible for a mental health evaluation or services through DOC. It was in the latter call, the caseworker recalled, that she had offered father an assessment and he declined, although she failed to include that information in her notes.

[2] The DHS caseworker had been a caseworker for about a year when she was assigned to B's case, and she had worked with only one other incarcerated parent, who was not moved around like father was.

manner and had communicated with prison counselors to the best of its ability to try to determine what services could be provided to father. In its written permanency judgment, the only "service" that the court marked as having been provided to father by DHS was visitation with B.

Father appeals the juvenile court's judgment. In his first assignment of error, father challenges the court's determination that DHS made reasonable efforts to reunify B with him. In his second and third assignments of error, father challenges the juvenile court's reasoning related to reasonable efforts, which are not proper assignments of error, so we treat those as part of the first assignment of error. *See* ORAP 5.45(3). In his fourth assignment of error, father asserts that the juvenile court erred in changing B's permanency plan, because DHS did not make reasonable efforts. Thus, the only substantive issue on appeal is whether the juvenile court was correct in concluding that DHS made reasonable efforts to reunify B with father.

## ANALYSIS

It is the policy of the State of Oregon to offer appropriate reunification services to parents to allow them the opportunity to adjust their circumstances, conduct, or conditions to make it possible for a child to safely return home within a reasonable time. ORS 419B.090(5). In accordance with that policy, as long as a child's permanency plan is reunification, the juvenile court must determine at each permanency hearing "whether [DHS] has made reasonable efforts *** to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home." ORS 419B.476(2)(a). Relatedly, before the court may change a child's plan from reunification to anything else, DHS must prove by a preponderance of the evidence both that (1) DHS made reasonable efforts to make it possible for the child to be reunified with his or her parent, and (2) despite those efforts, the parent's progress was insufficient to make reunification possible. *Dept. of Human Services v. S. M. H.*, 283 Or App 295, 305, 388 P3d 1204 (2017).

"DHS's efforts are evaluated over the entire duration of the case, with an emphasis on a period before the hearing sufficient in length to afford a good opportunity to assess parental progress." *Id.* at 306 (internal quotation marks omitted). Whether DHS made reasonable efforts toward reunification "depends on the particular circumstances." *Dept. of Human Services v. M. K.*, 257 Or App 409, 416, 306 P3d 763 (2013). "Whether DHS has provided reasonable efforts should be evaluated in view of the nature of the parent's problems." *Dept. of Human Services v. D. M. R.*, 301 Or App 436, 443, 455 P3d 599 (2019) (internal quotation marks omitted). "Thus, it is through the lens of the jurisdictional basis that we must analyze the reasonableness of DHS's efforts." *Id.*

"Reasonable efforts to reunify a child with [his or] her parent focus on ameliorating the adjudicated bases for jurisdiction and give parents a reasonable opportunity to demonstrate their ability to adjust their conduct and become minimally adequate parents." *Id.* at 444 (internal quotation marks omitted); *see also Dept. of Human Services v. L. L. S.*, 290 Or App 132, 142, 413 P3d 1005 (2018) ("Our case law is clear: DHS's efforts qualify as reasonable for purposes of ORS 419B.476 if and only if those efforts supply a parent with a reasonable opportunity to demonstrate his ability to adjust his conduct and become a minimally adequate parent." (Internal quotation marks and brackets omitted.)). In general, DHS must give parents a reasonable opportunity to demonstrate their abilities and become minimally adequate parents even if DHS "will bear the expense of providing the necessary services." *M. K.*, 257 Or App at 417.

"It is well established that DHS is not excused from making reasonable efforts toward reunification simply because a parent is incarcerated." *L. L. S.*, 290 Or App at 139. The length and circumstances of incarceration may be properly considered as part of the totality of circumstances in assessing the reasonableness of DHS's efforts toward reunification. *Id.* at 149. However, although the "circumstances and duration of a parent's incarceration may well bear significantly on whether a parent is able to make 'sufficient progress' as required by ORS 419B.476(2)(a)," a

parent's incarceration does "not absolve DHS of its separate obligation, over the life of the case, to make reasonable efforts to give the parent the opportunity to ameliorate the bases for jurisdiction." *Dept. of Human Services v. C. L. H.*, 283 Or App 313, 330, 388 P3d 1214 (2017).

In this case, the fundamental disagreement between father and DHS is whether and to what extent DHS had to offer father services *beyond those available through DOC* to prove that it made reasonable efforts toward reunification. Father argues that DHS could not just rely on the services provided through DOC, when it is undisputed that DOC did not offer any of the services that father needed, and then claim that DHS made reasonable efforts but that father did not make sufficient progress despite DHS's efforts. Father argues that, on this record, DHS failed to give him a reasonable opportunity to demonstrate his abilities and become a minimally adequate parent.

In response, DHS recognizes that "it is undisputed that father needs substance abuse treatment, mental health services, and parent training before [B] can safely be placed in his care." DHS also admits that it has not offered any of those services to father during his incarceration, except for offering him a mental health assessment in July 2019 (without attendant services). However, DHS argues that this is not a case of DHS not giving a reason for not providing needed services—its reason is that DOC did not offer those services or father did not qualify for them. In DHS's view, "the question is whether it is subjectively reasonable to expect DHS to provide the services father needs while he is in prison, in the custody of [DOC]," and the juvenile court correctly answered that question in the negative, because it would be "contrary to the goal of achieving timely permanency for children to compel a child to languish in foster care when a parent's incarceration prevents participation in a treatment program needed to address the reasons why the child was initially removed from the home."

With that understanding of the parties' arguments, we turn to the legal question of whether, on this record, the juvenile court erred in concluding that DHS made reasonable

efforts to reunify B with father, as a predicate to changing B's plan to adoption.

We have previously rejected a contention that DHS must fund all services that it requires a parent to complete, "regardless of cost," in a juvenile dependency case. *M. K.*, 257 Or App at 416. At the same time, we also have rejected the notion that "evidence of a greater-than-usual cost in providing services aimed at reunification is enough, standing alone, to justify a decision not to provide those services." *Id.* Ultimately, the proper inquiry requires the juvenile court to "consider not only the burdens that the state would shoulder in providing those services, but also what benefit might reasonably be expected to flow from them." *Id.* "Put bluntly, when a parent contends that DHS's efforts have not been reasonable because the agency has declined to provide a particular service, the court's 'reasonable efforts' determination should include something resembling a cost-benefit analysis, at least when *** the agency itself has deemed that service to be 'key' to the reunification plan." *Id.* at 418.

We recently explained in helpful detail how the "benefit" portion of that cost-benefit-like analysis should be understood:

> "[I]n assessing the 'benefit' portion of the required cost-benefit analysis, the juvenile court must consider the importance of the service that was not provided to the case plan and the extent to which that service was capable of ameliorating the jurisdictional bases. Further, when available, the juvenile court also properly considers evidence tied to a parent's willingness and ability to participate in and benefit from the particular service that was not provided. However, *** an assessment of the 'benefit' of a particular service does not turn upon whether that service will ultimately make reunification possible. While a juvenile court may consider the length and circumstances of a parent's incarceration in assessing DHS's efforts, the reasonable-efforts inquiry focuses on whether DHS provided the parent with an opportunity to demonstrate improvement regarding the jurisdictional bases.

> "Put another way, our cases do not stand for the proposition that DHS may withhold a potentially beneficial service to an incarcerated parent (or any parent) simply because, in

DHS's estimation, reunification with the child is ultimately unlikely even if the parent successfully engages in the services and programs that DHS provides. Such a proposition is inconsistent with ORS 419B.476(2)(a), which treats evaluation of the agency's efforts as a distinct inquiry from whether the parent has made 'sufficient progress' to make reunification possible. The agency must make reasonable efforts so that the juvenile court is in a position to evaluate the parent's progress toward the goal of reunification. Although a court appropriately considers a parent's responsiveness when assessing the choices that DHS made with respect to that parent, in most circumstances, whether a parent has attempted to make appropriate changes, or is likely to be able to parent the child within a reasonable time, bears primarily upon whether the parent has made adequate progress toward reunification—not on the reasonableness of DHS's efforts.

"The circumstances and duration of a parent's incarceration may well bear significantly on whether a parent is able to make 'sufficient progress' as required by ORS 419B.476(2)(a). However, those circumstances alone do not absolve DHS of its separate obligation, over the life of the case, to make reasonable efforts to give the parent the opportunity to ameliorate the bases for jurisdiction. Consequently, a juvenile court properly assesses the agency's efforts, and particularly the 'benefit' of services that were not provided, in terms of their potential effect upon the jurisdictional bases, not in terms of whether, in light of all the surrounding circumstances, reunification will ultimately be possible."

*C. L. H.*, 283 Or App at 328-31 (internal quotation marks, emphases, brackets, and citations omitted).

With those principles in mind, we consider some of our existing precedent involving incarcerated parents.

In *M. K.*, the juvenile court asserted jurisdiction over a child based on the father's incarceration and his status as a convicted and untreated sex offender. 257 Or App at 412. The child did not remember the father, so DHS intended to provide services to develop their relationship, but it would not do so until the father completed a psychosexual evaluation so that DHS could determine whether visitation would be safe. *Id*. at 413. The evaluation was the "key

element" for the father to progress toward reunification. *Id.* When DHS learned that it would cost $5,000 to conduct the evaluation in prison—which was more than five times what DHS usually paid—DHS put off the evaluation, telling the juvenile court that the father could undergo a more reasonably priced evaluation in a year when he was released from prison. *Id.* at 414. The juvenile court concluded that DHS made reasonable efforts toward reunification, because, although the father needed the evaluation, it was reasonable for DHS not to provide it while father was incarcerated, given the cost. *Id.* at 414-15. We reversed, explaining that the juvenile court had erred when it considered only the cost of providing the evaluation in prison and did not also consider the potential benefit of doing so, including avoiding a delay that might significantly postpone—and thus lessen— the chances of family reunification. *Id.* at 418-19.

In *Dept. of Human Services v. S. W.*, the juvenile court asserted jurisdiction over a child based on the father's use of intoxicants, incarceration, and need for DHS assistance to establish a safe relationship with the child. 267 Or App 277, 280, 283, 340 P3d 675 (2014). Early in the case, DHS made significant efforts to engage the father in treatment and to develop his relationship with the child. *Id.* at 290. Over time, however, DHS's efforts diminished. *Id.* at 289. In a particular 33-month period, DHS sent letters of expectation, called the father twice, met with the father once, encouraged the father to write letters to the child and delivered them, and arranged for a psychological evaluation—but went lengthy periods without any contact. *Id.* The juvenile court determined that, nonetheless, over the life of the case, DHS made reasonable efforts toward reunification. *Id.* at 284. Describing it as a "difficult case," we affirmed. *Id.* at 289. Although DHS's efforts in the 33 months prior to the permanency hearing were "hardly vigorous," DHS had made significant efforts earlier in the case, the father did not respond to those efforts constructively, and the father did not explain how further efforts by DHS would have materially advanced his ability to reunify with the child, particularly given his lengthy prison sentence. *Id.* at 290-93. "Considering the totality of the circumstances, including the department's early efforts, father's pattern of

conduct, the specific circumstances of his incarceration, the potential benefit of the additional efforts that father contends should have been made, and the needs of [the child]," the juvenile court did not err in its reasonable-efforts determination. *Id.* at 294-95.

Finally, in *C. L. H.*, the juvenile court asserted jurisdiction over a child based on the father's inability to adequately care for her given her medical condition, the father's anger-control problem, and the father's failure to supply adequate food to the child. 283 Or App at 317. For the first five months of the case, the father did not visit the child or participate in any court-ordered services. *Id.* The father then went to jail, and, for the next eight months, DHS did not speak to him, even though it knew that he was incarcerated. *Id.* at 317-18. Then, over five months, the DHS caseworker spoke to the father on the phone five times, sent him photos of the child, and contacted the child's doctor to inquire about getting materials about the child's condition for the father. *Id.* at 318. The juvenile court concluded that DHS made reasonable efforts, citing *S. W.* and concluding that there "would have been no 'benefit' to DHS making additional efforts because, regardless, nothing that DHS could do would change the fact that father was and would continue to be incarcerated until almost a year after the permanency hearing." *Id.* at 320, 324.

We reversed, stating that the juvenile court had failed to consider all of the relevant circumstances in conducting the cost-benefit analysis. *Id.* at 331-32. Although providing additional services would not change the fact of the father's incarceration, the "benefit" had to be evaluated "in terms of its importance to the case plan and the potential magnitude of its effect on the jurisdictional bases," not in terms of "the probability that the service would *actually* facilitate reunification." *Id.* at 327-28 (emphasis in original). Because DHS did not meaningfully attempt to provide services to help the father to ameliorate the jurisdictional bases, the juvenile court had little evidence concerning his willingness and ability to participate in and benefit from those services. *Id.* at 331. The father had resisted services early in the case, but, unlike in *S. W.*, there was no "body of evidence derived from an extended period of time demonstrating that

there would be little 'benefit' to DHS providing additional services" to him. *Id.*

From the foregoing cases, we discern that DHS is not required to do the impossible. That is, if it is truly not possible to provide a particular service to a particular parent, the "cost" necessarily outweighs the benefit, no matter how great the benefit might be.[3] But DHS must show that it is truly not possible. Otherwise, if providing a needed service is possible—albeit perhaps expensive or inconvenient— the court must engage in a cost-benefit-like analysis that is fundamentally tied to the goal of providing the parent, over the life of the case, with a reasonable opportunity to demonstrate improvement, if not ameliorate the jurisdictional bases. *See C. L. H.*, 283 Or App at 327. It is for DHS to establish the cost. As for the benefit, the court is to consider the importance of the service to the case plan and the extent to which that service was capable of ameliorating the jurisdictional bases. *Id.* at 327-28. The court also may consider, when available, evidence of the parent's willingness to participate in and benefit from services and, when applicable, evidence of the length and circumstances of the parent's incarceration. *Id.* at 328-29. But "an assessment of the 'benefit' of a particular service does not turn upon whether that service will ultimately make reunification possible." *Id.* at 329. Whether DHS has made reasonable efforts is also a separate inquiry from whether the parent has made sufficient progress. *Id.* at 330.

We return to the facts of this case. The difficulty for DHS in this case is twofold. First, on the cost side, DHS

---

[3] Father argues that, if DHS viewed his incarceration as an "insurmountable barrier" to providing needed services, it should have moved for an order under ORS 419B.340(5), a statute that allows the juvenile court to relieve DHS of its obligation to make reasonable efforts toward reunification in certain circumstances. That argument is not well taken. ORS 419B.340(5) applies only in the most extreme circumstances—such as when a parent has caused the death of a child or the child's other parent, has intentionally starved or tortured a child, has been convicted of specific crimes, or has had his or her rights to another child terminated involuntarily—none of which appear to exist here. We disagree with father that, if DHS *cannot* provide a needed service, DHS will never be able to establish reasonable efforts, and unless DHS is excused from that requirement by an order under ORS 419B.340(5), the child's plan may never be changed away from reunification. *See* ORS 419B.476(2)(a) ("In making its determination, the court shall consider the ward's health and safety the paramount concerns.").

failed to provide any evidence to the juvenile court regarding the cost of providing to father a DHS/CWP approved drug and alcohol rehabilitation program, a DHS/CWP approved parent training program, or DHS/CWP approved mental health services—in person or otherwise—while he is incarcerated. DHS did not even consider providing services to father while he is incarcerated, instead taking the position that, if DOC did not have any services available, then father would not get them, at least for so long as he is incarcerated. An "incarcerated parent is not charged with the burden of finding solutions to institutional barriers." *Dept. of Human Services v. M. C. C.*, 303 Or App 372, 383, 463 P3d 592 (2020). DHS's failure to even consider providing services to father during his incarceration, given the lack of services available through DOC, in itself seriously hampered the juvenile court's ability to conduct a proper cost-benefit analysis.

Second, on the benefit side, both DHS and the juvenile court appear to have given little, if any, consideration to the benefit of the services that were not provided to father. "[W]hen a parent complains that DHS has not provided adequate services, a court making a 'reasonable efforts' determination must consider not only the burdens that the state would shoulder in providing those services, but also what benefit might reasonably be expected to flow from them." *M. K.*, 257 Or App at 416. Here, it is undisputed that the services that were not provided are needed, are critical to the case plan, and go directly to ameliorating the jurisdictional bases. That is particularly true of substance abuse treatment, in that DHS has described this case as "a case about substance abuse," but also true of parent training and mental health counseling. Providing those services to father would give him an opportunity to make progress on key issues, and it would put the juvenile court in a position to evaluate father's progress toward the goal of reunification. The benefit of providing those services while father is incarcerated is amplified by the fact that father was scheduled for release possibly as early as seven months after the permanency hearing, making his period of incarceration a critical time to be working toward reunification. *Cf. M. K.*, 257 Or App at 418 ("Given the importance of the psychosexual evaluation to the reunification plan, the juvenile court should

have considered the extent to which the family might benefit if father received a psychosexual evaluation promptly, instead of waiting a year to be evaluated after his release.").

DHS did offer one mental health service to father, when it offered in July 2019 to arrange a mental health assessment. That offer related to only one jurisdictional basis though, and it is not clear how important that basis was to the case plan, given the conflicting information about father's mental health history. Moreover, it appears undisputed that, no matter what the outcome of an assessment, DHS did not intend to provide any counseling or other mental health services to father while he remained in prison. An assessment alone, without resulting services, would not allow father to demonstrate improvement in his mental health or put the juvenile court in a position to evaluate father's progress in addressing that jurisdictional basis.[4]

There is no question that dependency cases involving incarcerated parents present unique challenges. *S. W.*, 267 Or App at 286. Yet we have long recognized "that the fact of incarceration, standing alone, does not relieve DHS of its obligation to make reasonable efforts to ameliorate the bases of jurisdiction." *L. L. S.*, 290 Or App at 140. Here, the juvenile court focused almost entirely on the inconvenience to DHS of setting up services for father to receive in prison, without meaningfully considering the actual *cost* of doing so

---

[4] Under the circumstances, we also reject any suggestion that father declining a mental health assessment in July 2019 demonstrates a general unwillingness to engage in services, as relevant to DHS's ongoing obligation to provide services. It is undisputed that father engaged in every service available to him in prison, and the DHS caseworker testified that father himself expressed frustration about the lack of mental health services available in prison. When father declined DHS's offer, he pointed out that DOC had determined that he did not need mental health services and did not qualify for them, and it must be remembered that DHS was not offering to provide any actual counseling or the like, only an assessment. In those circumstances, father's response to DHS's offer is not particularly telling as to his willingness to participate in mental health services, and it says nothing about his willingness to participate in substance abuse treatment or parent training. In any event, "a parent's resistance to DHS's efforts does not categorically excuse DHS from making meaningful efforts toward that parent." *S. M. H.*, 283 Or App at 306; *see also D. M. R.*, 301 Or App at 444-45 ("[A] parent's prior choice not to use DHS services does not excuse DHS from continuing to offer them."). This is not a case in which a "body of evidence derived from an extended period of time" demonstrates that father is unwilling to engage in services. *C. L. H.*, 283 Or App at 331.

or the *benefit* of doing so. The court's legal analysis therefore did not comply with the standard laid out in our case law. *Cf. M. K.*, 257 Or App at 418 ("[I]n concluding that DHS's efforts were reasonable, the juvenile court appears to have considered only the cost of performing the psychosexual evaluation while father is incarcerated, and not the potential benefits of providing that evaluation promptly, instead of waiting until he is released."). Relatedly, the court's statements that it would not be "reasonable to expect DHS to send a counselor out to the facility" to provide mental health services to father and that it would not "be reasonable to require DHS to send someone out to conduct drug and alcohol counseling just for [father]" are conclusory assertions, not derived from a proper cost-benefit analysis.

In sum, when DHS determined in 2018 that DOC did not have any substance abuse programs, parent training programs, or mental health services available to father to help him address his problems relevant to the jurisdictional bases, DHS could not simply stop there and not even consider other ways to provide services to father while he is incarcerated. *Cf. State ex rel Dept. of Human Services v. H. S. C.*, 218 Or App 415, 427, 180 P3d 39 (2008) ("[W]hen a parent is detained by immigration authorities and DHS makes no inquiry into what services are possible at that location, the mere detention of the parent does not excuse the state from making reasonable efforts by inquiry and arranging the services that might be available under the circumstances."). Because DHS failed to explore any options beyond whatever happened to be available through DOC, it is impossible to know what other options might exist or what they would cost. It is correspondingly impossible to know whether DHS's efforts were reasonable or not. Because the burden is on DHS to prove that it made reasonable efforts toward reunification, *S. M. H.*, 283 Or App at 305, it follows that the trial court erred in concluding on this record that DHS made reasonable efforts.

Father faces significant obstacles to becoming a minimally adequate parent for B. Reunification may or may not be achievable in the end, and the passage of time while father is incarcerated may play a role in the ultimate outcome. *See C. L. H.*, 283 Or App at 333 (recognizing that, if

the child bonded with her foster parents while the father was incarcerated, and the father was "unable to develop a relationship with her within a reasonable time," that would bear significantly on the sufficiency of the father's progress). However, father must be given a reasonable opportunity to demonstrate his ability to adjust his conduct and become a minimally adequate parent, taking into account the relative cost and benefit of specific services. *See id.* (notwithstanding the possibility that reunification might not occur, the juvenile court was not authorized to change the plan "[u]ntil the agency makes meaningful efforts to provide father with reunification services"). On this record, the juvenile court erred in concluding that DHS made reasonable efforts toward reunifying B with father, as a predicate to changing B's permanency plan to adoption.

Reversed.