Submitted April 8, affirmed June 25, 2014

In the Matter of A. B.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

R. B.,
fka R. J., aka J. J.,
*Appellant.*

Lincoln County Circuit Court
118055J1;
Petition Number 118055, 138079J1;

In the Matter of C. B.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

R. B.,
fka R. J.,
*Appellant.*

Lincoln County Circuit Court
118055J2;
Petition Number 118055;
A155451

329 P3d 787

Peter Gartlan, Chief Defender, and Holly Telerant, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Judy C. Lucas, Senior Assistant Attorney General, filed the brief for respondent.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

HADLOCK, J.

**HADLOCK, J.**

In this dependency case, mother appeals from judgments entered after a consolidated permanency hearing and jurisdictional adjudication. The issues on appeal concern the permanency plan for mother's two daughters and the juvenile court's assumption of jurisdiction based on a new allegation.

In September 2011, the juvenile court took jurisdiction over the two girls, A and C, now ages eight and three, pursuant to ORS 419B.100(1)(c),[1] based on admitted allegations that (1) "[mother's] behavior is impulsive or she cannot or will not control her behavior thereby making the * * * children unsafe"; and (2) mother's behavior "exemplif[ies] her lack of parenting knowledge, skills, and motivation necessary to ensure her children's safety thereby making the * * * children unsafe."[2] For two years, the permanency plan for the children was reunification. However, after a hearing in September 2013, the juvenile court changed the permanency plan from reunification to adoption. On appeal mother asserts that the record does not support the juvenile court's change in the permanency plan, specifically, its determination that mother has not made sufficient progress to allow the children to safely return home. ORS 419B.476(2)(a).

Before the permanency hearing, in July 2013, the Department of Human Services (DHS) filed a second dependency petition, alleging that the children are within the jurisdiction of the juvenile court under ORS 419B.100(1)(c), because "mother * * * suffers from a mental illness, emotional illness, or mental impairment that interfere[s] with her ability to safely parent" the children.[3] At the hearing, the juvenile court considered evidence addressing the new

---

[1] ORS 419B.100(1)(c) provides, in relevant part that "the juvenile court has exclusive original jurisdiction in any case involving a person who is under 18 years of age" and "[w]hose condition or circumstances are such as to endanger the welfare of the person or of others."

[2] The jurisdictional judgment included identical findings as to father. Mother and father are currently married, but father does not dispute the court's continued jurisdiction, does not wish to be considered as a custodial resource for the children, and supports the change in the permanency plan to adoption.

[3] The second petition contained an identical allegation as to father.

allegation and, in addition to changing the permanency plan to adoption, the court made findings and entered judgments assuming jurisdiction over the children based on the new allegation. Mother separately appeals from that jurisdictional judgment, contending that DHS did not prove the new allegation. She also asserts that, to the extent that the juvenile court based its "reasonable efforts" and "sufficient progress" determinations on the new allegation, the court erred. We affirm on both matters, which have been consolidated for appeal.

Mother has not requested that we exercise our discretion to take *de novo* review, ORS 19.415(3)(b), and we decline to do so. *See* ORAP 5.40(8)(c) (we exercise *de novo* review "only in exceptional cases"). Accordingly, in reviewing the juvenile court's judgments, we "view the evidence as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013). We are bound by the juvenile court's findings of historical fact as long as there is "any evidence" to support them. *State v. S. T. S.*, 236 Or App 646, 655, 238 P3d 53 (2010). We review the juvenile court's conclusions for legal error. *Id.* When the juvenile court does not make findings on disputed issues of fact, but the evidence supports more than one factual conclusion, we presume that the court decided those issues in a manner consistent with its ultimate conclusion. *Id.* We state the facts consistently with those standards.

Before moving to Oregon in 2011, the family lived in Montana. Beginning in 2009 and continuing through January 2011, mother had contact on multiple occasions with the Child and Family Services Division of the Montana Department of Public Health and Human Services. Mother and father are married, but they were separated for a while in Montana and, during that time, mother had a brief relationship with Hagel, with whom she had a child in 2009 that she gave up for adoption. The Montana agency investigated allegations of abuse of mother by both Hagel and father, and allegations of sexual abuse of A by Hagel and a family friend.

In Montana, A's physician referred her for a psychological assessment, and a report in the record shows diagnoses of attention deficit/hyperactivity disorder (ADHD), post-traumatic stress disorder, and sexual abuse.

The family moved to Oregon in February 2011, and mother initiated contact with DHS in May 2011, reporting concerns about domestic violence and substance abuse by father. Mother also reported to DHS that father smoked marijuana in A's presence and was attempting to treat A's ADHD with marijuana smoke. Shortly thereafter, father moved away, and mother did not follow up with services offered by DHS. Because the caseworker believed that mother was able to keep the children safe, DHS did not intervene at that time.

On June 30, 2011, mother brought A to the DHS office in Newport, seeking a voluntary placement because she was unable to manage A's behavior (the triggering event having been A spilling cereal on the floor and telling mother to "go to hell"). DHS took A into custody at that time under a voluntary placement agreement. At a home visit the next day, the caseworker developed concerns about the safety of the home, as well as mother's mental health and her care of the children. The caseworker observed that C, then age nine months, seemed to be at the developmental level of a four-month-old child, was dirty and quiet, "rigid and withdrawn," and shook when attempting to crawl. DHS took both A and C into protective custody on that day.

As noted, the juvenile court first assumed jurisdiction over the children in September 2011, pursuant to admitted allegations that (1) "[mother's] behavior is impulsive or she cannot or will not control her behavior thereby making the * * * children unsafe"; and (2) mother's behavior "exemplif[ies] her lack of parenting knowledge, skills, and motivation necessary to ensure her children's safety thereby making the * * * children unsafe."

After the court assumed jurisdiction, mother was evaluated by Dr. Sweet, a psychologist. In a report of October 2011, Sweet noted that mother was defensive and evasive.

For that reason, he opined, it was difficult to provide a clear and accurate diagnosis of mother, but he believed that she had a depressive disorder and a personality disorder with dependent and passive-aggressive features.

After Sweet's evaluation in October 2011, DHS referred mother to individual mental health therapy with Coos County Mental Health, which she began in January 2012. She also attended classes in parenting, anger management, and self-improvement, and had regular visits with the children. Gradually, mother made significant improvements in her interactions with the children during visitation.

The children were in foster care the first time from July 1, 2011, until August 29, 2012, when DHS returned the children to mother's care for a trial home visit. But the visit, which lasted about four months, did not go well. For about a year before the children's trial home visit began, mother had been in a relationship with Hales, and he was living in the family home. At some point during the trial home visit, Hales hit A, and mother left the house with the children until Hales had moved out. Mother testified that, during the trial home visit, there was a break in the children's counseling services due to scheduling difficulties, and that illness kept A from attending school for part of the time. Also during that time, mother discontinued her own individual-counseling sessions. In addition, mother returned the children for visits with the foster parents "every other week or every week."

Mother testified that issues with her apartment caused her to move out in December 2012, and to move into a house belonging to the parents of an old friend, Smith, with whom she had recently reconnected. But DHS removed the children from mother's care a week or two thereafter, citing safety concerns and concerns for mother's mental state, and the children were returned to their foster placement. The court-appointed special advocate reported that both children were affected adversely by the failed reunification. Mother later told psychologist Sweet that she "got into a comfort zone" during the trial visit, "thought she could get away with things," and "got lazy." She also told Sweet that

she had focused too much on some classes she was taking "and was not focusing on the house or the girls."

After DHS removed the children from mother's care the second time, mother resumed individual mental health counseling sessions and completed an on-line course for parenting children with ADHD. Mother's counselor testified that mother was still somewhat guarded and defensive in March 2013 (as she apparently had been during her 2012 counseling sessions), but was "much more motivated for treatment." It had taken the counselor "a really long time to even get her to admit that she was struggling with depression." The counselor testified at trial that mother was "now in a place where she [was] actively working on her depression issues." Mother also completed an anger management class.

Smith and mother became romantically involved in April 2013, and began to remodel the basement of Smith's parents' home into a three-bedroom apartment, where they were living rent free at the time of the hearing with Smith's children and several pets. At the hearing, Smith and mother testified that they plan to marry after they finalize their divorces. Smith is employed and plans to support the family financially while mother cares for the children at home.

Sweet, who conducted a second evaluation of mother in April 2013, testified at the permanency hearing. He noted that mother was more open and cooperative in the second evaluation, and was willing to acknowledge her problems, including her depression and her parenting challenges. After this second evaluation, Sweet diagnosed mother with a "major depressive disorder, recurrent, moderate," and a personality disorder with passive-aggressive and dependent features. He noted that mother wanted to continue working on the skills necessary to manage her depression and A's behavior. He opined, "If she does continue to make progress and can demonstrate that she can apply the skills to her life situation, including meeting the girls' needs, then you might consider reunification." But, Sweet testified, although mother was in a better position now, she was still "at a very early point" in dealing with her depression and parenting, and it was Sweet's opinion that it would take a year

of counseling to reach the point where the children could return home.[4] Sweet was asked about the impact on the

---

[4] Sweet testified:

"Q. And what changes, if any, did you see from the evaluation in October of '11 to the one in April '13?

"A. The biggest change is the fact that she is now able to recognize that she's had a long problem with depression that goes back many years. And she is recognizing this year that the depression is having a very negative impact on how she functions specifically as a parent. So she's admitting it and wanting to do something about it.

"Q. Okay. And that was particularly evident in the April evaluation, correct?

"A. That's correct.

"Q. So she's made progress from October 2011 to April of 2013?

"A. Well she's made progress in dealing with the depression, and she was just starting to deal with it when I saw her. But to be able to—her progress, the type of progress needed to process a person that says, yeah, I've really been depressed since I was a teenager and now I want to do something about it, but actually getting the depression controlled, she's still at a very early point.

"Q. Okay. And in your April evaluation, you said that if she continued to make progress on her issues, you would support reunification?

"A. I did say that.

"Q. And you wouldn't support reunification if her mental disorders interfered with her ability to parent, would you?

"A. No, I wouldn't.

"Q. Have you seen [mother] since that evaluation in April?

"A. I have not.

"Q. So if information's developed at the hearing that [mother] has made sufficient progress in addressing her issues, would that reinforce your opinion that reunification should be considered?

"A. Yes."

On cross-examination, Sweet was asked whether, based on the information in the clinical notes by mother's therapist, he would

"support reunification at this time? Does it appear she's made that type of progress?

"A. No, no, no. Not yet."

Sweet was asked whether,

"given the combination of the two, the child with these needs and the Mother with these issues, can you tell us what kind of time frame we might most optimistically be looking at to have Mom be able to adequately parent a child of this type and the second child as well?

"A. You could be looking at a year for Mom to get things stabilized and to keep up with the treatment and the support that she needs. It's kind of hard to tell because part of it has to do with helping [A] with her depression and making sure that [A] takes the right medication for things. But I would say it's a rough estimate."

children of waiting one more year, and he responded, "Well it's horrible on them."[5]

Sweet also evaluated A in April 2013 and issued a report in which he described A as

> "a child who literally never sat still for more than a brief period of time under direct instruction from me. She walked around the room, rode a tricycle, got into the drawers and cupboards. There were times that she also purposefully turned her back to me and refused to answer questions."

Sweet diagnosed A with ADHD, major depression (moderate), and an adjustment disorder. Sweet testified, "She's a very high needs child and is going to be for a long time. * * *. It takes very committed caregiver people to put forth a lot of effort on a day to day basis." He opined that A would benefit from a combination of medication and a highly structured home and school environment. Without such structure and permanence, he testified, A was "at high risk for further developmental problems."[6]

In Sweet's view, both of the children were adversely affected in their development by the failed return to mother. Sweet testified that reunification could be possible if mother continued to make progress but he did not think that mother had made sufficient progress at the time of the hearing for the children to be returned to her care.

---

[5]  "Q. And we've had a DHS case open since 2011 with these girls in which we've had them in foster care, returned them to Mom, and then they came back into care. They've actually been out of home for a substantial period of time. But we're addressing both [A] and [C] here, and you're saying Mom is at a point where it may be up to a year, an additional year beyond what we've already done here. And what about these girls waiting a year? What's the impact on them?

"A. Well it's horrible on them. Especially [A] who has much higher needs than [C].

"Q. Well are these kids who can wait, is [C] a child who can wait one more year for Mom to be able to be at the point where she could have the kids returned to her care?

"A. What's happened here with the kids going home to Mom and failing again is pretty detrimental to their development. You have to, for high needs, give support to the children."

[6]  The foster mother's report also reflected A's difficulties. She reported that A lacks appropriate social skills, is overly "friendly," but has difficulty getting along with others because she is bossy, lies and interrupts, talks excessively about boyfriends/girlfriends, and uses language that is not appropriate for her age.

        In its ruling from the bench, the juvenile court first
found that DHS had satisfied its burden to prove the new
mental-health allegation by a preponderance of the evidence.
ORS 419B.310(3) ("The facts alleged in the petition showing
the child to be within the jurisdiction of the court * * * must
be established by a preponderance of competent evidence.").

        The court then addressed the permanency plan:

> "And then in terms of the permanency involving Mother
> * * * this is what the Court is looking at is—and I did go
> back to the original jurisdiction allegations and jurisdic-
> tional paragraphs, specifically 2(B), Mother's behavior is
> impulsive or she cannot or will not control her behavior,
> 2(D), attitudes and behaviors exemplify her lack of parent-
> ing knowledge, skills and motivation necessary to ensure
> the safety of her children."

        The court traced the case back to its origins, not-
ing that DHS's involvement with the family began when
mother brought then five-year-old A to a DHS office, seek-
ing a voluntary out-of-home placement for A because mother
could not manage the child's behavior. The court identified a
pattern in mother of seeking out and engaging services but
not following through with them, which the court described
as consistent with the allegations of the first petition that
mother "cannot or will not control her behavior" and that
she "lacks the parenting knowledge or skills or motivation
necessary to ensure her children's safety." The court found
it significant that, over the course of the court's two-year
involvement with the family, mother had had three roman-
tic relationships. The court was particularly concerned that
during that time, mother had not yet been able to follow
through with her intention to find stable employment, that
she still relied on the foster parents for respite, and that she
had not yet learned to function independently: "[T]he goal
is, and we've talked about this several times about you func-
tioning as an independent person and you having it together
so that you could care for your girls. And I still don't see that
happening." [7] Ultimately, the court found that mother had

---

[7] The court explained:

        "My concern is that you're not working. And although you're not working,
    we're not seeing the steps or the things that we need to see for you to change

not made sufficient progress to allow the children to safely return home. Because of the length of time that the children had been in foster care, *see* ORS 419B.498(1)(a) (requiring the filing of a petition to terminate parental rights and proceed to adoption if the child has been in substitute care "for 15 months of the most recent 22 months"), and the evidence concerning the adverse effect of further delay on the children, the court determined that it was necessary to change the permanency plan to adoption.

In her first two assignments of error, mother contends that the juvenile court erred in determining that she had not made sufficient progress. In her third and fourth assignments, mother contends that the juvenile court erred in changing the permanency plan to adoption. In a combined argument, mother asserts that the record does not support the juvenile court's determination that mother has not made sufficient progress "toward ameliorating the adjudicated bases for jurisdiction."

When the permanency plan at the time of the hearing is reunification, in order to change the child's plan away from reunification, DHS bears the burden to show by a preponderance of the evidence that (1) it made reasonable efforts to reunite the family; and (2) despite those efforts, the parent's progress was insufficient to make it possible for the child to return safely home. ORS 419B.476(2)(a); *see Dept. of Human Services v. S. T.*, 240 Or App 193, 195, 248 P3d 427 (2010) (applying preponderance-of-evidence standard in case involving change in permanency plan). The particular issues established in the jurisdictional judgment provide the framework for the court's analysis of those two questions. *Dept. of Human Services v. N. T.*, 247 Or App 706, 715, 271 P3d 143 (2012). Thus, a parent's progress is evaluated by reference to the facts that formed the bases for juvenile court jurisdiction. *Dept. of Human Services v. C. L.*, 254 Or App 203, 214, 295 P3d 72 (2012).

---

that I actually think you can safely parent the children because one of the things that you've said on the stand was, well, I'm gonna do this, and I'm gonna do this, and I'm still gonna use the foster parents. It's two years later. Okay? You're telling me in your own words that you still can't do it on your own. That you still need the foster parents to be there."

Mother first asserts that the alleged bases for jurisdiction (impulsiveness; inability to control behavior; lack of parenting knowledge, skills and motivation) were too vague to allow a determination whether mother's progress was sufficient. We agree with the state that now is not the time to challenge the original, admitted bases for jurisdiction, and we reject mother's challenge on that ground without further discussion.

Mother also contends that, in determining that mother had not made sufficient progress, the juvenile court mistakenly relied on facts extrinsic to the proven bases for jurisdiction—specifically the newly pleaded jurisdictional ground of mental illness. *See Dept. of Human Services v. A. R. S.*, 256 Or App 653, 660-65, 303 P3d 963, *rev den*, 354 Or 386 (2013) (the court may not rely on an unadjudicated personality disorder as a basis for continuing jurisdiction). The court's permanency judgment includes findings that:

"4) Mother self-reported being diagnosed with depression when she was 17 years old.

"5) Mother's current provider said Mother is making progress for the first time, but testified it could be six months to a year.

"6) Dr. Sweet testified these children need permanency, Mother is overwhelmed by their needs, his testimony for Mother (assuming she is recognizing her own issues) to be able to parent these children independently is a year. He testified it is unreasonable to delay permanency for these girls, especially for [A]."

Mother contends that the court's findings show that the court measured mother's progress in part against her diagnosed depression and dependent personality disorder, which had not previously been a basis for jurisdiction and could not form a basis for continuing jurisdiction.

We reject mother's contention. In a closing statement, mother's attorney asserted that, if the juvenile court determined that mother's mental-health problems formed an additional basis for dependency jurisdiction, that could not "be used against her in this permanency hearing because that was not a prior allegation that [had] been proven against her." Instead, the lawyer argued, mother would have

to "be offered services that would ameliorate that condition." Neither DHS's attorney nor the children's attorney challenged mother's assertion that the permanency determination had to be based on the allegations in the original petition. Nor did the juvenile court express disagreement with that proposition. To the contrary, the court's oral ruling explicitly linked the permanency determination to the allegations of the original petition.

True, the juvenile court also addressed mother's mental-health issues in its findings. And mother is correct that a juvenile court cannot base a change to a permanency plan "on a parental condition or characteristic that is not 'one that fairly can be implied from the facts found in the jurisdictional judgment." *Dept. of Human Services v. J. R. L.*, 256 Or App 437, 447, 300 P3d 291 (2013) (quoting *Dept. of Human Services v. N. M. S.*, 246 Or App 284, 300, 266 P3d 107 (2011)). The key question is whether the jurisdictional judgment "would put a reasonable parent on notice that [the bases for that judgment] would be used to continue jurisdiction over the child and to change the permanency plan for the child." *Id.* at 448. In the particular circumstances that this case presents, we conclude that mother's mental-health problems "fairly can be implied" from the stipulated allegations in the original jurisdictional petition and judgment, and that those documents sufficed to put mother on notice that she needed to address her underlying mental-health problems to regain custody of her children.

First, the original judgment's references to mother's impulsivity, the fact that she either "*cannot* or will not control her behavior" (emphasis added), and her lack of "motivation" to safely parent her children suggested that mother had mental-health problems that would need to be addressed before her children could be returned to her. Second, evidence in the record supports the juvenile court's finding that mother's depression was "not a new issue" and confirms that the original jurisdictional judgment can be read (and was in fact read) as implicating concerns about mother's mental health. The caseworker who visited the home on July 1, 2011, after mother brought A to the DHS office, cited concerns about mother's mental health as a basis for taking both children into protective custody. The record also establishes

that, except during several months while the children were in her care, mother has attended mental-health therapy since January 2012 and has been directly addressing her depression (as well as other issues) since no later than July of that year. Those events, considered in context, are consistent with our reading of the original jurisdictional judgment as "fairly implying" mother's mental-health issues. Thus, to the extent that the court took into account the sufficiency of mother's progress on those issues when it changed the permanency plan, that was permissible, even though the particulars of those issues were not detailed in the original judgment. We conclude that, although not more particularly identified in the original jurisdictional judgment, mother's mental health underlay the original bases for jurisdiction.

Further, as the juvenile court found, mother was on notice that mental-health concerns needed to be addressed and ameliorated. Thus, this case is not one in which mother has not had a reasonable opportunity to address the conditions that prevented her reunification with the children or notice that she needed to do so. Cf. A. R. S., 256 Or App at 663-64 (reversing a permanency judgment that was based on the mother's mental-health condition when "nothing in the jurisdictional judgment" would have alerted the mother that she needed to address that condition). Indeed, given that mother received a psychological evaluation and mental-health services starting shortly after entry of the original jurisdictional judgment, nothing in the record suggests that mother would have been provided with any different services—or would have participated more successfully in services—had that judgment more particularly identified her mental-health problems as a basis for jurisdiction.

Mother also contends that the evidence is insufficient to support the juvenile court's determination that DHS established that mother has not made sufficient progress to allow the children's return home. Mother cites evidence that she has made considerable progress in her parenting skills, that she is focused on having the children, and that her behavior is not impulsive.

Although there is evidence that could support a contrary finding, under our standard of review, N. P., 257 Or

App at 639, we conclude that the evidence was legally sufficient to permit the juvenile court to find by a preponderance of the evidence that, as of the date of the permanency hearing, the conditions that provided the bases for jurisdiction in September 2011 have not been ameliorated sufficiently to make it possible for the children to safely return home. ORS 419B.476(1)(a). A, in particular, has special needs that require a structured and stable environment. There is evidence that, although mother has completed many different services and has made progress, she is not yet able to provide that kind of home environment. There is evidence that, most recently, mother has not been in compliance with her letter of expectation with DHS. Mother signed an agreement in May 2013 that mentioned that pets can make a house dirty and unsanitary, and that required her to have a household free of pets. Mother acknowledged at the hearing that she had, in the past, had an unkempt household, and admitted that she deliberately ignored the no-pet requirement (two cats and two ferrets lived with the family) because she thought the prohibition on pets was unreasonable. Mother also acknowledged that she missed "a few" appointments with her therapist in the 30 days leading up to trial (she could not recall the exact number) because of migraine headaches; she also had missed several visits with the children in June 2013. Although mother estimated that she had missed four out of eight or 10 scheduled visits with her children in the two months preceding trial, she deemed her visitation "fairly consistent." That evidence supports the trial court's determination that mother's impulsivity and lack of parenting knowledge, skills, or motivation continue in a way that threatens the children's wellbeing. Sweet's reports and testimony further support the finding that mother is not yet able to care for the children, especially A, who has special needs and is at high risk of further developmental problems if she does not have a highly structured environment. We conclude that the juvenile court did not err in determining that mother has not made sufficient progress for the children to be safely returned home.

The remaining question, raised in mother's fifth and sixth assignments, is whether the juvenile court erred in finding jurisdiction based on the new allegation that

"mother * * * suffers from a mental illness, emotional illness, or mental impairment that interfere[s] with her ability to safely parent." We conclude that the evidence is legally sufficient to support the juvenile court's finding. *See Dept. of Human Services v. G. J. R.*, 254 Or App 436, 443-44, 295 P3d 672 (2013) (state meets its burden by presenting evidence from which a reasonable factfinder could find, by a preponderance of the evidence, either that a current risk of harm exists from the additional allegation standing alone, or that the additional allegation contributes to or enhances the risk associated with the already established bases of jurisdiction).

Affirmed.