Submitted March 31, affirmed July 13, petition for review denied October 20, 2022 (370 Or 404)

In the Matter of G. R. O.,
fka B. B. M., a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

R. C.,
*Appellant.*

Marion County Circuit Court
20JU07030; A177087

514 P3d 538

Father appeals the juvenile court's judgment that changed the permanency plan for his son, G, from reunification to adoption. On appeal, he argues that the juvenile court erred both in its determination that the Department of Human Services (DHS) made reasonable efforts toward reunification and in its determination that father made insufficient progress toward reunification. *Held*: The record supports the juvenile court's determinations that DHS made reasonable efforts toward reunification and that father had made insufficient progress toward reunification with his son. Therefore, the juvenile court did not err in changing G's permanency plan away from reunification.

Affirmed.

Jennifer K. Gardiner, Judge.

Aron Perez-Selsky filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Christopher A. Perdue, Assistant Attorney General, filed the brief for respondent.

Before Powers, Presiding Judge, and Lagesen, Chief Judge, and Hellman, Judge.

HELLMAN, J.

Affirmed.

**HELLMAN, J.**

Father appeals the juvenile court's judgment that changed the permanency plan for his son, G, from reunification to adoption. Father claims that the juvenile court erred both in its determination that the Department of Human Services (DHS) made reasonable efforts toward reunification and in its determination that father made insufficient progress toward reunification. We affirm the judgment of the juvenile court.

Father expressly does not ask for *de novo* review in this case. Accordingly, we determine whether the "evidence was sufficient to permit the challenged determination." *Dept. of Human Services v. N. P.*, 257 Or App 633, 640, 307 P3d 444 (2013).

We have three key parts to our review in juvenile dependency cases. First, "[w]e defer to the juvenile court's explicit findings of historical fact if those findings are supported by any evidence in the record[.]" *Dept. of Human Services v. S. M. H.*, 283 Or App 295, 297, 388 P3d 1204 (2017). Next, "we assume that the juvenile court implicitly found predicate facts necessary to support its disposition." *Id.* Finally, we "'view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the juvenile court's disposition and assess whether, when so viewed, the record was legally sufficient to permit' the juvenile court's change to the permanency plan." *Id.* (quoting *Dept. of Human Services v. T. M. S.*, 273 Or App 286, 288, 359 P3d 425 (2015)).

"The juvenile court's determinations whether DHS's efforts were reasonable and the parent's progress was sufficient are legal conclusions that we review for errors of law." *Dept. of Human Services v. G. N.*, 263 Or App 287, 294, 328 P3d 728 (2014).

### BACKGROUND FACTS

G was born in March 2020. DHS removed him from his mother shortly after his birth due to his prenatal exposure to methamphetamine and his mother's addiction and

inability to safely parent him. After he was removed from his mother, G was placed into a foster home along with his sister, K, who has a different father. G has remained in the same foster home for his entire life.

At the time of G's birth, mother was involved in a relationship with R. Although R signed G's birth certificate, making him G's legal father, both mother and R denied that R was G's biological father. Instead, mother named father as the biological father. However, father was not legally determined to be G's father until February 2021.

Father was incarcerated at the time paternity was established. He admitted to the allegation that he was "unable to be a custodial resource for [G]." He also admitted to "lack[ing] the parenting skills necessary to safely and appropriately parent" G and that he required DHS's assistance to obtain those skills. On those admissions, DHS took jurisdiction over G.

After starting his work with DHS, father complied with DHS's requirements. He participated in twice-monthly video visits with G, which was the only option due to his incarceration. The caseworker testified that father was fully engaged with G during that time, and that G was responsive to father's efforts. Father read the parenting books that DHS sent to him and provided DHS with his written summaries of the books. He sent drawings and photographs to G. He participated in the programming that was available to him in custody, which was limited due to the COVID-19 pandemic. Notably, the pandemic caused DHS to eliminate the parenting programs that would otherwise have been available to father. Father also maintained good conduct in prison and was in a minimum-security facility. His situation made him eligible for an alternative incarceration program (AIP), which would have made father eligible for early release upon completion of the program. With the AIP, father likely would have been released by April or May 2022. Father provided DHS information about relatives who could possibly serve as prerelease placements for G. DHS followed up on those recommendations, but due to their individual circumstances, none of father's proposed placements were able to take G.

Because of father's continued incarceration and G's need for "consistency and stability," DHS sought a change in his permanency plan from reunification to adoption. Two days before G's permanency hearing, father was involved in a fight with another inmate, which resulted in his placement in segregation and his transfer to a medium-security facility. As a result, father also became ineligible for an AIP, and his earliest projected release date was extended by at least 6 months. At the permanency hearing, DHS argued that father's continued incarceration and the extension of his possible release date due to his involvement in the fight meant that father had "not made sufficient progress to allow [G] to return within a reasonable amount of time based on [G's] specific needs [and] age ***."

At the permanency hearing, G's foster parent testified that G was "very bonded" with his sister K and G was "doing great." His foster parent reported that G was "a very happy, active, inquisitive child" who was "[c]onstantly on the go" and "in everything." The foster parent noted that G required "constant supervision because he's just so active" but that he was a "very sweet, sweet little boy." The foster parent also recognized that G "can get frustrated and angry. He can have tantrums and doesn't always realize, you know, if it's a safe place. He'll throw himself on the ground," so someone was always with him "making sure that we're directing him in the right ways and helping him learn as he grows." The foster parent emphasized G's routine as something that was helpful for him and noted that he had challenges self-soothing and sleeping through the night.

Dr. Towell, a child psychologist, evaluated G in December 2020. Towell's report recognized that G was developmentally "on track" and did not currently have any "areas of significant deficit." However, Towell noted that because of his prenatal substance exposure, G had a higher risk for developmental, emotional, and behavioral problems as he grew up.

At trial, Towell provided additional insight, testifying that "[f]or young children, especially children with areas of vulnerability such as prenatal exposure, they have a high need for permanency in that they need a highly skilled

caregiver who's able to meet their needs and monitor their development and behavior over time. Engage them in services if and when needed and certainly having a permanent caregiver with whom to build an attachment." Towell also explained that there was risk to G if he were to be moved from his foster parent, because

> "[a]s a child gets older and remains in a sustained consistent placement, they continue to build that healthy attachment, which includes building trust and a bond with their current caregiver. When that placement is disrupted in terms of a child, relationship is disrupted and you're disrupting that attachment and the trust that that child has been able to build with that caregiver, which places them at significantly elevated risk for both short and long-term emotional, behavioral and relational problems for which he's currently protected, having been in the same placement."

According to Towell, there would be a very high risk of short- and long-term harm to G's mental health and G's relational abilities if G were removed from the foster home at the age of two and one-half, despite any services DHS was able to provide. Towell also found that there were "a few areas of vulnerability in terms of some *** early adaptive skills." G "had some challenges with regards to a tongue tie," which Towell testified "can be connected with impeding in speech issues." Towell further testified that G had "weak" interpersonal relationships and communication skills, including receiving and expressing language. Towell determined that G did not need an immediate intervention but that those issues needed to be closely monitored.

Father testified on his own behalf, telling the juvenile court about the work he had done with DHS, the reasons that he wanted to parent G, his commitment to change, and his plans after his release from prison. He also explained how and why the prison fight happened, and his understanding that there may still be a way for him to participate in the AIP.

After hearing all the evidence, the juvenile court granted DHS's request to change the permanency plan away from reunification to adoption. The juvenile court found that DHS made reasonable efforts under ORS 419B.476(2)(a)

to reunify the family. The juvenile court outlined DHS's efforts, including that DHS provided father visits two times a month, parenting books, an action letter, and gave father an opportunity to parent by way of identifying other potential caregivers when he could not be a caregiver himself. The juvenile court noted that DHS had followed up on father's "identified family members and his identified placement options" which gave father "an opportunity to parent insofar as making decisions for *** care and placement." The juvenile court further found that DHS had engaged "in conversations with [father] every month and [talked] with him about what he's learned through the parenting books, having conversations about where [G] is, as well as [provided] him with updates and photographs."

On the question of whether father had made sufficient progress toward reunification, the juvenile court first indicated that it had read all of the defense exhibits, which included father's summaries of the parenting books. The juvenile court found his summaries "insightful," and noted that father had articulated that he knew "that his anger could get in the way of" the patience he knew was necessary to parent a child. But the juvenile court then went on to explain that father's behavior, particularly his fight with another inmate, supported the conclusion that father had not made sufficient progress toward reunification. The court explained that the nature of the fight, including that father and the "other [inmate involved] had to be pepper sprayed three times before they would separate," indicated that there was more than a "quick flash, a quick loss of perspective," and that father had let his anger impede his ability to be involved in G's life. Because father let "his first instinctive emotional response rule the day" in his involvement in the fight, the court noted that father had lost the ability to visit with G and had "jeopardize[d] his AIP eligibility."

Given the realities of father's incarceration and with AIP eligibility unlikely, the court calculated that in "the best-case scenario," G would likely not be able to return home with father for an additional 17 months from the time of the hearing, putting G's total time in care at 35 months— G's whole life. In light of Towell's testimony regarding G's

diminishing capacity for developing relational attachments and G's "vulnerability in [G's] early adaptive skills," the court reasoned that that best-case scenario "removes this vulnerable child from their permanent caregiver at three years," at which point "the likelihood of [G] developing lasting mental health [and] behavioral issues is almost a certainty." The court determined that those circumstances reflected a lack of reasonable progress toward reunification with G. As a result of its findings, the juvenile court ordered a change in the permanency plan away from reunification.

On appeal, father argues that the juvenile court erred in determining that DHS made reasonable efforts toward reunification and erred in determining that father made insufficient progress toward reunification, and, as a result, that the juvenile court erred in changing G's permanency plan away from reunification. We address each argument in turn.

## ANALYSIS

It is well-established that

> "[w]hen the permanency plan at the time of a permanency hearing is reunification, the juvenile court is authorized to change the plan away from reunification only if DHS proves that (1) it made reasonable efforts to make it possible for the child to be reunified with his or her parent and (2) notwithstanding those efforts, the parent's progress was insufficient to make reunification possible. ORS 419B.476(2)(a); *Dept. of Human Services v. R. B.*, 263 Or App 735, 745, 329 P3d 787 (2014). DHS has the burden of proving both prongs by a preponderance of evidence. *Id.* In deciding whether to change the permanency plan away from reunification, the juvenile court must treat the child's 'health and safety [as] paramount concerns.' ORS 419B.476(2)(a)."

*S. M. H.*, 283 Or App at 305.

First, we conclude that the record supports the juvenile court's determination that DHS made reasonable efforts to make it possible for G to be reunified with father.

Whether DHS's efforts are reasonable depends on "the particular circumstances" of each case. *State ex rel Juv. Dept. v. Williams*, 204 Or App 496, 506, 130 P3d 801

(2006). DHS's efforts are "evaluated by reference to the facts that formed the bases for juvenile court jurisdiction." *Dept. of Human Services v. N. T.*, 247 Or App 706, 715, 271 P3d 143 (2012). For DHS's efforts to be considered "reasonable" under ORS 419B.476(2)(a), DHS must have given the parent a "reasonable opportunity to demonstrate their ability to adjust their conduct and become [a] minimally adequate parent ***." *Dept. of Human Services v. M. K.*, 257 Or App 409, 417, 306 P3d 763 (2013) (internal quotation marks omitted; brackets in original). The juvenile court evaluates DHS's efforts throughout the case, "with an emphasis on a period before the hearing 'sufficient in length to afford a good opportunity to assess parental progress.'" *Dept. of Human Services v. S. S.*, 278 Or App 725, 735, 375 P3d 556 (2016) (quoting *State ex rel Dept. of Human Services v. H. S. C.*, 218 Or App 415, 426, 180 P3d 39 (2008)).

We have recognized that a parent's incarceration alone does not excuse DHS from making reasonable efforts toward reunification. *Williams*, 204 Or App at 506 ("[I]ncarceration of a parent, without more, is not an aggravated circumstance that may serve as a basis for excusing DHS from making reasonable efforts toward reunifying the family."). In cases where the parent is incarcerated, however, the juvenile court can properly consider the "length and circumstances of a parent's incarceration" and "evidence specifically tied to [a parent's] willingness and ability to participate in services" as factors to determine whether DHS's efforts were reasonable. *S. M. H*, 283 Or App at 306 (internal citations omitted; brackets in *S. M. H.*).

The record supports the juvenile court's determination that DHS made reasonable efforts to reunify father and G. DHS's efforts were specifically targeted at the stated basis for jurisdiction that father lacked the necessary skills to safely parent G. *See Dept. of Human Services v. K. G. T.*, 306 Or App 368, 378, 473 P3d 131 (2020) (recognizing that the reasonableness of DHS's efforts must be assessed in light of the stated bases for jurisdiction). DHS arranged twice a month video calls between father and G, which went well. DHS also worked with the prison to try and obtain programming services for father. DHS provided father with

parenting books which he was able to read and understand. DHS spoke with father every month about his progress and provided him with updates on G. DHS also facilitated father's sending G photographs and drawings. DHS further worked with father on his suggestions for family members who could be possible prerelease placements for G.

In addition, when determining whether the record supported the juvenile court's conclusion that DHS's efforts were reasonable, we have evaluated whether additional efforts would have made a material improvement in addressing the jurisdictional basis. *S. M. H.*, 283 Or App at 308. Father argues that there was insufficient time between his acknowledgment of paternity and the permanency hearing for DHS's efforts to be considered reasonable, in light of the COVID-19 pandemic restrictions. To be sure, the pandemic did eliminate the availability of some services, such as parenting classes in prison and the possibility of in-person visits. But even within the pandemic constraints, DHS offered a broad scope of services, and father fully engaged in them. Notably, the record does not contain evidence about any specific additional efforts that would have made a material improvement in addressing the jurisdictional bases in this case.

We also determine that the record supports the juvenile court's determination that father made insufficient progress toward reunification with G. As noted, progress is assessed against the stated bases for DHS's jurisdiction. *S. M. H.*, 283 Or App at 310. For this part of the analysis, we rely on the juvenile court's determination that father made insufficient progress on the stated basis for jurisdiction that father was incarcerated and unable to be a custodial resource for G. Even crediting father's time estimates for release, as the juvenile court did, the record supports the juvenile court's determination that it would be 17 months, at best, before father would be able to reunify with G. That would mean that G would have spent 35 months— [G's] entire life—with the foster parent. The juvenile court also noted father's lengthy criminal history and the recent in-custody fight as reasons to believe that reunification may take even longer than that, which was a permissible conclusion to make on this record. *See id.* at 306 (noting that

"[w]hen assessing DHS's efforts, a juvenile court properly considers the length and circumstances of a parent's incarceration" (internal quotation marks omitted)).

Finally, the record supports the juvenile court's ultimate determination that 17 months was too long for G to wait, given that G had a greater need for permanency due to his "prenatal controlled substance exposure and his vulnerability in early adaptive skills." Although father argues otherwise, the evidence from Towell went beyond a bare assertion that G needed permanency. Towell opined, based on her experience and the existing research, that children like G who had prenatal controlled substance exposure are at a higher risk of having developmental, emotional, and behavioral issues as they age. Towell also identified specific places in which G fell below childhood development benchmarks. She further explained that G was in the "most sensitive age" for forming attachments and that disrupting that attachment creates a "significantly elevated risk for both short and long-term emotional, behavioral and relational problems." Finally, Towell determined that because of those factors, G needed permanency as soon as possible. As the juvenile court summarized, "we're looking at a best-case scenario that removes this vulnerable child from their permanent caregiver at three years, the likelihood of him developing lasting mental health, behavioral issues is almost a certainty."

Finally, in some cases, family placement can help alleviate concerns about timing when a parent is incarcerated, but here the record demonstrates that DHS and father unsuccessfully tried that route. DHS followed up on all of the possible placements that father suggested, but for a variety of personal reasons, none of the family members were available.

Because the juvenile court did not commit legal error in changing G's permanency plan away from reunification, we affirm the judgment.

Affirmed.