260 September 4, 2025 No. 794

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of B. S.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

A. R. S.,
*Appellant.*

Clackamas County Circuit Court
22JU05195; A186449

Michael C. Wetzel, Judge.

Submitted July 28, 2025.

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Kyle Sessions Vazquez, Deputy Public Defender, Oregon Public Defense Commission, filed the briefs for appellant.

Dan Rayfield, Attorney General, Benjamin Gutman, Solicitor General, and Jon Zunkel-deCoursey, Assistant Attorney General, filed the brief for respondent.

Before Aoyagi, Presiding Judge, Egan, Judge, and Pagán, Judge.

AOYAGI, P. J.

Affirmed.

**AOYAGI, P. J.**

In this juvenile dependency case, father appeals a judgment changing the permanency plan for his six-year-old son, B, from reunification to permanent guardianship. Father challenges the juvenile court's determination that the Oregon Department of Human Services (ODHS)[1] made reasonable efforts to reunify B with him.[2] Specifically, father argues that ODHS failed to assist him in understanding B's special needs and failed to provide batterer intervention services during father's incarceration. For the following reasons, we affirm.

## FACTS

In the absence of *de novo* review, which is neither requested nor warranted in this case, we are bound by the juvenile court's express and implied findings of fact so long as there is evidence in the record to support them. *Dept. of Human Services v. C. H.*, 373 Or 26, 46, 559 P3d 395 (2024). We state the facts accordingly.

B was born in February 2018. ODHS took B into protective custody in October 2022 and subsequently filed a dependency petition. B was placed with his maternal grandparents, who have a no-contact order against father. In April 2023, the juvenile court asserted dependency jurisdiction over B on five bases relating to father, one of which we subsequently reversed on appeal. The jurisdictional bases that remain in place are (1) that B has been exposed to domestic violence by father; (2) that B's developmental disabilities and/or delays require structure, supervision, and treatment that father failed to provide; (3) that father has engaged in a pattern of domestic violence with his family members and/or domestic partners and is currently in a domestically violent relationship with B's mother; and (4) that father has a pattern of engaging in violent and/or unsafe behavior and displays erratic behavior, which presents a risk of harm to B.

---

[1] Historically, we have typically referred to ODHS as "DHS," but we understand that the agency now prefers "ODHS." Both acronyms refer to the same agency.

[2] Father assigns error to the juvenile court's (1) reasonable efforts determination, (2) insufficient progress determination; and (3) change of plan. However, father's arguments are directed entirely to the first issue, with no separate discussion of the other claims of error. We therefore address only the reasonable efforts determination.

In summer 2024, ODHS asked the juvenile court to change B's permanency plan from reunification to permanent guardianship. Mother did not contest the change of plan, but father did. A contested permanency hearing took place on August 1, 2024. After hearing the evidence, the court determined that ODHS had made reasonable efforts to reunify B with father, and that father had made insufficient progress to have B returned home within a reasonable time, and it changed the plan.

We briefly summarize the pertinent evidence from the August 2024 permanency hearing. Six-year-old B has autism, is mostly nonverbal, and has specialized needs. Prior to dependency jurisdiction being established, father declined services, as well as declining family time with B. Between the establishment of jurisdiction in April 2023 and the first permanency hearing in September 2023, father's engagement with ODHS was "very volatile." He sent many inappropriate texts and emails to ODHS employees in which, among other things, he berated the caseworker, called people names, and sent nude and semi-nude photos of B's mother. During visits with B, father would engage in "really rough play" with B, and he sometimes threatened to spank B. ODHS offered father "family decision meetings" to help him identify "barriers to him engaging in services or interacting with [B]," but father was not interested. Father also was not interested in services and questioned the need for them. ODHS offered father batterer intervention services, parent training, and a psychological evaluation, but he was not interested and did not sign the necessary releases to enroll in services. When later asked why he did not engage in services during that time period, father testified that he "wasn't focused on the right things" at that point.

In October 2023, father was arrested and spent four to five months in county jail. While father was in jail, ODHS again asked that he sign a release to get into a batterer intervention program, and that time father signed it. The ODHS caseworker then spoke with both the program and the jail, and the jail would not allow for the service to be provided while father was incarcerated. Separately, ODHS found someone to do a psychological evaluation of father

in the jail, but father missed the appointment. ODHS also provided video visits with B from jail, which father did not always accept or attend.

Immediately upon father's release from jail in February 2024, ODHS did a referral to a batterer intervention program, which had refused to accept a referral until he was released. ODHS scheduled two more psychological evaluations for father, in March 2024 and May 2024, both of which he missed. ODHS set up once-a-week family time. And, once father signed a release in March 2024, ODHS referred him to a parent training program, for which father was still on the waitlist at the time of the August 2024 hearing. As for the batterer intervention program, father delayed doing the intake until the latter half of May 2024, and there was a waitlist, but father was scheduled to start the program the week after the August 1 hearing. Father continued to question the need for services. He also continued to have "inconsistent" visitation with B. Over the life of the case, father had been offered 91 visits with B, as well as transportation support (gas vouchers and bus tickets) for in-person visits, and had attended 23 visits (approximately 25 percent).

With respect to B's individual needs, B receives at-home therapy focused on his autism diagnosis and has an individualized education plan (IEP) at school. Because B is placed with his maternal grandparents, who have a no-contact order against father, father is unable to attend B's at-home therapy sessions. Father acknowledged in his testimony that, in the past, he did not try hard enough to understand B's needs and took "full accountability" for having "not reached out to try to learn more." As for the present, father suggested that he "would probably be a lot more involved" if he was made part of the "team" supporting B, but that he was "not being involved in it by DHS."

ODHS put on evidence that, although father could not attend B's therapy sessions at B's maternal grandparents' house, ODHS had otherwise tried to help father understand B's needs. The caseworker had numerous conversations with father about B's needs, at her instigation. Father received a copy of B's psychological evaluation (which he did not read),

and B's IEP. The caseworker also sent father B's six-month therapy reports, which father acknowledged receiving but asked no questions about. The caseworker tried to connect father with B's therapy supervisor to discuss B's progress, but he failed to follow up. The caseworker explained that, if father had followed through with the therapy supervisor, ODHS would have been able to set up a therapy session during family time. And the caseworker told father that he could attend B's counseling sessions at school, but father never did, and he failed to attend a feedback session with the school counselor to which he was invited and initially agreed to attend.

Based on the foregoing evidence, the juvenile court determined that ODHS had made reasonable efforts to reunify B with father, and that father had made insufficient progress for B's return, and it changed B's plan to permanent guardianship.

## ANALYSIS

On appeal, father challenges the juvenile court's determination that ODHS made reasonable efforts toward reunification. Father makes two specific arguments in that regard: first, that ODHS "failed to help father understand [B]'s special needs while [B] was receiving specialized therapies that father was legally excluded from attending" and second, that ODHS failed to make "any effort to provide father with services during father's five-month incarceration." ODHS disagrees on both points.[3]

The juvenile court may change a child's plan away from reunification only if ODHS proves (1) that ODHS "made reasonable efforts to make it possible for the child to be reunified with his or her parent," and (2) "notwithstanding those efforts, the parent's progress was insufficient to make reunification possible." *Dept. of Human Services v. S. M. H.*, 283 Or App 295, 305, 388 P3d 1204 (2017); ORS 419B.476(2)(a). As to the first requirement, reasonable efforts are efforts that "supply a parent with a reasonable opportunity to demonstrate his ability to adjust his conduct and become a minimally

---

[3] ODHS also challenges preservation. Because it does not affect the disposition, we assume without deciding that father adequately preserved his claim of error.

adequate parent." *Dept. of Human Services v. L. L. S.*, 290 Or App 132, 142, 413 P3d 1005 (2018) (internal quotation marks and brackets omitted). Whether ODHS made reasonable efforts in a particular case is necessarily a fact-dependent, circumstance-specific inquiry. *Dept. of Human Services v. M. K.*, 257 Or App 409, 416, 306 P3d 763 (2013). The court is to consider ODHS's efforts over the entire duration of the case, but with an "emphasis on a period before the hearing sufficient in length to afford a good opportunity to assess parental progress." *S. M. H.*, 283 Or App at 306 (internal quotation marks omitted). We review a determination that ODHS made reasonable efforts for legal error. *Dept. of Human Services v. G. N.*, 263 Or App 287, 294, 328 P3d 728, *rev den*, 356 Or 638 (2014).

We first address father's argument that ODHS failed to make reasonable efforts by failing "to help father understand [B]'s special needs while [B] was receiving specialized therapies that father was legally excluded from attending." We are unpersuaded. Although father could not attend B's therapy sessions at B's maternal grandparents' home due to the no-contact order, ODHS took numerous steps to try to help father understand B's special needs. That included repeatedly discussing B's needs with father; giving father B's psychological evaluation, B's IEP, and B's six-month therapy reports; trying to connect father with B's therapy supervisor, which would have facilitated doing a therapy session during family time; and notifying father that he could attend counseling sessions at the school. Father has not identified anything else that ODHS could have realistically done under the circumstances to help him understand B's needs, as relevant to the jurisdictional basis that B's developmental disabilities and/or delays require structure, supervision, and treatment that father failed to provide.

We next consider father's argument that ODHS failed to make reasonable efforts by failing to provide him with batterer intervention services while he was in jail. "It is well established that DHS is not excused from making reasonable efforts toward reunification simply because a parent is incarcerated." *L. L. S.*, 290 Or App at 139 (internal quotation marks omitted).

In assessing whether ODHS has made reasonable efforts with respect to an incarcerated parent, "the juvenile court can properly consider the length and circumstances of a parent's incarceration and evidence specifically tied to a parent's willingness and ability to participate in services as factors to determine whether DHS's efforts were reasonable." *Dept. of Human Services v. R. C.*, 320 Or App 762, 769, 514 P3d 538 (2022) (internal quotation marks and brackets omitted). It is also relevant "whether additional efforts would have made a material improvement in addressing the jurisdictional basis." *Id.* at 770. Ultimately, DHS's efforts may be "reasonable" even if they fall short of ideal. *Dept. of Human Services v. C. S. C.*, 303 Or App 399, 410, 463 P3d 582 (2020) ("Viewing DHS's reunification efforts on behalf of father under the totality of the circumstances, we conclude that the services DHS provided, while perhaps less than ideal, were nonetheless sufficient to support the juvenile court's reasonable-efforts determination.").

Here, father went to jail 18 months after B was taken into care and 12 months after the juvenile court asserted dependency jurisdiction. Up to that point, father had consistently declined to engage in services. His interactions with ODHS had been "very volatile." In his own words, he "wasn't focused on the right things." Once father went to jail, ODHS again offered him the release for a batterer intervention program, and that time he signed it, but the jail would not allow services to be provided during father's incarceration. This is not a case where ODHS failed to even inquire into the availability of services. *See, e.g.*, *State ex rel Dept. of Human Services v. H. S. C.*, 218 Or App 415, 427, 180 P3d 39 (2008) (holding that ODHS did not make reasonable efforts, in part because it did not even inquire into what services were available to a parent in immigration detention). It is a case where the county jail where father was housed would not allow the specific service to be provided at the jail—and ODHS is not required to do the impossible. *See Dept. of Human Services v. K. G. T.*, 306 Or App 368, 381, 473 P3d 131 (2020) (explaining that ODHS "is not required to do the impossible" and that, if ODHS establishes that "it is truly not possible to provide a particular service to a

particular parent," it cannot be said that they failed to make reasonable efforts by not providing that service).

It is also notable that father was incarcerated for only four to five months, which does not allow much time to investigate alternatives that the jail authorities might agree to, and that father's demonstrated willingness to engage in services was only slightly improved while in jail. Father signed the one release, but he missed a scheduled psychological evaluation at the jail, and he also missed video visits with B.[4] *Cf. S. M. H.*, 283 Or App at 308-09 (noting, in case holding that ODHS did not make reasonable efforts as to an incarcerated mother, that the mother had initially resisted services but was regularly in contact with her children and "was demonstrably willing to engage in services" by the time of her incarceration, at which point ODHS "did not meet mother's efforts in kind"). Finally, it is doubtful that more vigorous efforts by ODHS to get father started in a batterer intervention program would have made a material difference, given that ODHS immediately referred father to the program upon his release from jail in February 2024—eight months before the permanency hearing at which the plan was changed—only to have father wait three months to schedule the intake meeting.

Given the totality of the circumstances, the juvenile court did not err in determining that ODHS made reasonable efforts toward reunifying B with father. And father has not identified any alleged error in the court's determination that father had not made sufficient progress for B to return home in a reasonable time. It follows that the court did not err in changing B's permanency plan.

Affirmed.

---

[4]     We do not give too much weight to father missing some video visits while in jail, as it is unclear from this record whether he did so by choice or due to jail-related circumstances beyond his control. But we do give it some consideration, given that father's visits have been inconsistent throughout the life of the case.